UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RICHARD M. CULLEN                    Case No. 21-CV-
and MARY C. CULLEN,

        Plaintiffs,

vs.

CITY OF SAINT IGNACE, ANTHONY
D. BROWN, DARCY D. LONG,
CONSTANCE A. LITZNER, COUNTY
OF MACKINAC, SCOTT A. STRAIT,
MELISSA WATSON, and PHIL SMITH,
individually and in their official capacities,
and jointly and severally,

        Defendants.
_____
GARY T. MIOTKE (P41813)
Attorney for Plaintiffs
6828 Park Avenue
Allen Park, MI 48101
(313)-388-4809
gmiotke@miotkelawoffice.com
_____

## COMPLAINT AND DEMAND FOR JURY TRIAL

    NOW COME the Plaintiffs, by and through their attorney, and for their

Complaint they state that:

<u>JURISDICTION, PARTIES, VENUE</u>

1. This action arises out of the employment of Plaintiff, RICHARD M. CULLEN ("Mr. Cullen").

2. Count I is an action to enforce civil rights pursuant to 42 USC 1983.  This Court has jurisdiction over Count I pursuant to 28 USC 1331 and 28 USC 1343(a)(3) and (4).

3. This Court has jurisdiction over Counts II, III, IV, V, and VI by virtue of the doctrine of supplemental jurisdiction, 28 USC 1367.

4.  Plaintiff, MARY C. CULLEN ("Mrs. Cullen") and Mr. Cullen (collectively "Plaintiffs") are residents of the City of Saint Ignace, County of Mackinac, State of Michigan.

5.  Defendant, CITY OF SAINT IGNACE ("City") is a Michigan municipal corporation that exists by virtue of the laws of the State of Michigan within the Western District of Michigan, Northern Division.

6.  Defendant, ANTHONY D. BROWN ("Mr. Brown") is a resident of a municipality that exists within the Western District of Michigan, Northern Division.

7.  Defendant, DARCY D. LONG ("Mr. Long") is a resident of a municipality that exists within the Western District of Michigan, Northern Division.

8. Defendant, CONSTANCE A. LITZNER ("Ms. Litzner") is a resident of a municipality that exists within the Western District of Michigan, Northern Division.

9. Defendant, COUNTY OF MACKINAC ("County") is a Michigan municipal corporation that exists within the Western District of Michigan, Northern Division.

10. The City is located within the County.

11. Defendant, SCOTT A. STRAIT ("Mr. Strait") is a resident of a municipality that exists within the Western District of Michigan, Northern Division.

12. Defendant, MELISSA WATSON ("Ms. Watson") is on information and belief an individual doing business out of the County of Livingston, State of Michigan who conducted business in the Western District of Michigan, Northern Division as stated in and for all times material to this Complaint.

13. Defendant, PHIL SMITH ("Mr. Smith") is on information and belief an individual doing business out of the County of Livingston, State of Michigan who

conducted business in the Western District, Northern Division as stated in and for all times material to this Complaint.

14. The City, Mr. Brown, Mr. Long, and Ms. Litzner are referred to collectively herein as the "City Defendants". For all times material to this Complaint, Ms. Litzner was the City's Mayor, Mr. Long was the City's City Manager, and Mr. Brown was the City's Chief of Police.

15. The County and Mr. Strait are referred to collectively herein as the "County Defendants". For all times material to this Complaint, Mr. Strait was the County's Sheriff.

16. Ms. Watson and Mr. Smith are referred to collectively herein as the "Team of 3 Defendants".

17. The events giving rise to this case arose within the Western District of Michigan, Northern Division.

<u>BACKGROUND FACTS</u>

18. For all times material to this Complaint, the Plaintiffs have been a married couple residing in the City and the County.

19. Plus, for all time material to this Complaint, Mr. Cullen had been employed by the City as a Police Officer in the City's Police Department until the wrongful termination of his employment on January 29, 2021.

20. Mr. Cullen started working for the City as a Police Officer in or around April 2008.

21. Additionally, prior to being hired by the City, Mr. Cullen had served in the U.S. Military and had served as a police officer with another law enforcement agency.

22. On or about February 4, 2019, Mr. Brown was hired as the Chief of Police for the City's Police Department.

23. It was most unusual that the City hired Mr. Brown as its Police Chief.

24. During his approximately 15-year career as a police officer, Mr. Brown had worked for at least 6 different police agencies, not counting his non-MCOLES-certified security employment.

25. Such instability in a law enforcement career suggests significant problems with a police officer that police departments have overlooked provided the police officer leaves his or her department before the problems must be addressed in a public manner.

26. Indeed, when Mr. Brown applied for a Police Officer position with the City in or around 2018, the City declined to hire him because of his dishonesty during the interview process.

27. Despite this, the City later hired Mr. Brown as its Chief of Police.

28. In Mr. Cullen's 4 ½ years of military service and 18 years as a Police Officer, his disciplinary record was virtually spotless.

29. Unfortunately, this dramatically changed after Mr. Brown became the City's Police Chief.

30. On June 30, 2019 at approximately 8:17 p.m., Mr. Cullen issued violations to several individuals for failing to pay boat launch fees.  One of the individuals was then a City Councilman of the City, namely Lucas Paquin ("Mr. Paquin").

31. At around 10 p.m. on June 30, 2019, Mr. Brown called Mr. Cullen and criticized Mr. Cullen for issuing the citation to a City Councilman.

32. Mr. Cullen disagreed. He noted that he wrote violations to 5 different violators at the same location. It would have been unethical to pick and choose between them.

33. Mr. Brown told Mr. Cullen that Mr. Paquin deserved a "professional courtesy".

34. Mr. Cullen disagreed stating that he had witnessed Mr. Paquin committing the same offense several times before.

35. After they are issued, such violations are reported to the City's Police Department.

36. Further, per the City's charter and/or code, a complaint and warrant are to be submitted to the Mackinac County Prosecutor if such violations are not paid or successfully contested.

37. On information and belief, this full process was followed with respect to four of these violations, including the one issued to Mr. Paquin.

38. That is, four of the cited violators including Mr. Paquin failed to successfully contest or to pay the violations.

39. Thus, on or about July 18, 2019, such complaints and warrants were submitted for these violators to the Mackinac County Prosecutor.

40. On July 23, 2019 at around 4 a.m., Mr. Brown called Mr. Cullen and again criticized Mr. Cullen for pursuing the violation as well as the complaint and warrant against Mr. Paquin.

41. Shortly after the call ended, Mr. Brown called Mr. Cullen again. Mr. Brown said that he was sitting outside of Mr. Cullen's house with his lights off for awhile and wondered what Mr. Cullen was doing at his house on shift.

42. On July 24, 2019, Mr. Brown issued a written reprimand to Mr. Cullen purportedly for not giving an accurate location when dispatch asked for his hourly safety check.

43. Mr. Cullen grieved the written reprimand and won the grievance with the assistance of his union.

44. On January 1, 2020, Mr. Brown left a sticky note on Mr. Cullen's daily report for failing to note which report he was working on.

45. Yet, every other Police Officer from the previous week had received no such note despite having handled these things in the same way that Mr. Cullen had.

46. On January 16, 2020, Mr. Brown gave Mr. Cullen two verbal warnings allegedly for Insubordination and Poor Job Performance.

47. These verbal warnings were unjustified. Ultimately, they were withdrawn by Mr. Brown after being contested by Mr. Cullen and his union.

48. Besides being employed as a City Police Officer, Mr. Cullen has engaged in many community and/or volunteer activities.

49. One such activity is that he has been and continues to be the Head Coach of the Varsity Wrestling Team for the local high school.

50. In January 2020, Mr. Cullen called in sick to care for the Plaintiffs' 6-year old daughter.

51. Due to her otherwise being alone, the Plaintiffs' 6-year old daughter accompanied Mr. Cullen to wrestling practice.

52. Presumably to see if Mr. Cullen was actually telling the truth, Mr. Brown showed up at the practice for the Varsity Wrestling Team.

53. Mr. Brown had and has never otherwise shown up at any such Varsity Wrestling Team practices.

54. On February 13, 2020, Mr. Brown told Mr. Cullen that Mr. Cullen was scheduled for mandatory over-time on February 15, 2020.

55. Mr. Cullen advised Mr. Brown that (A) this violated the collective bargaining agreement between his union and the City and (B) he would be out of town for a wrestling tournament.

56. Mr. Brown was already aware that Mr. Cullen was supposed to be out of town for the wrestling tournament when he told Mr. Cullen that Mr. Cullen was to work this mandatory over-time.

57. Unsurprisingly, Mr. Brown insisted that this unlawful over-time assignment was not negotiable.

58. On February 15, 2020, Mr. Cullen showed up for work and then checked into service via phone.  He noted that Mr. Brown was monitoring his actions for the purpose of trying to discipline him.

59. On February 19, 2020, Mr. Brown stalked Mrs. Cullen.

60. Mrs. Cullen found Mr. Brown's actions in watching her to be so disturbing that she made an in-person complaint together with a written complaint to Mike Stelmazek ("Mr. Stelmazek") who was the City's City Manager at this time.

61. On February 24, 2020, Mrs. Cullen received a letter from Mr. Stelmazek wherein Mr. Stelmazek stated that (A) he found Mr. Brown's explanation for his actions to be possible and (B) he would be taking no actions against Mr. Brown.

62. On March 3, 2020 Mr. Brown issued three written reprimands to Mr. Cullen allegedly for Insubordination, Neglect of Duty, and Gross Insubordination from the incidents or events that took place on February 15, 2020 and February 17, 2020.

63. These written reprimands were unjustified. Ultimately, as noted below, they were dismissed after being contested by Mr. Cullen and his union.

64. Prior to May 8, 2020, Mr. Cullen was looking for official police records regarding an individual who had experienced significant mental health issues.

65. Based on his examination of the then existing records, Mr. Cullen discovered that Mr. Brown had fabricated and/or altered official police records in various ways related to an incident involving a suicidal individual.  This matter is referred to as the "suicide incident".

66. Presumably based on a personal relationship with the suicidal individual who was the actual subject of the records ("Actual Subject"), Mr. Brown altered information about the incident to show or imply a different subject, a different address, a different file class, and a different reason for police involvement in the incident.

67. The different subject ("Different Subject") was another individual who had been known to law enforcement agencies to have had significant mental health issues.

68. Basically, it appeared that Mr. Brown had intentionally falsified official police records to conceal the identity and involvement of the Actual Subject in the suicide incident by making it appear that the Different Subject was the person who was involved in this incident.

69. On May 8, 2020, Mr. Cullen took this information to his union and requested advice since it pertained to outrageous misconduct on the part of Mr. Brown as the City's Police Chief.

70. The union advised Mr. Cullen to report the matter to the Michigan State Police ("MSP").

71. Thus, Mr. Cullen reported information about Mr. Brown's misconduct to the MSP.

72.  The MSP agreed that this appeared to be wrong and merited investigation. The MSP also told Mr. Cullen not to say anything to the City.

73. On May 19, 2020, Mr. Cullen and the City's Police Sergeant (the "Sergeant") filed a formal complaint with the MSP about Mr. Brown's misconduct.

74. Beyond addressing Mr. Brown's outrageous misconduct in fabricating official police records related to the suicide incident, this complaint addressed other serious misconduct by Mr. Brown, including evidence that implicated Mr. Brown in other discrepancies in which reports and/or body cam footage were deleted off the Police Department's server in order to eliminate evidence that implicated Mr. Brown in other wrongful acts.

75. For example, in an assault case, a female individual was listed as a witness. On the day after the incident, Mr. Brown interviewed her at her residence for about 90 minutes.  This was not reported, not on body cam, and not listed in the official report.  Mr. Brown should have ensured that all of these things were done with respect to this interview.

76. Sometime after Mr. Brown's interview of the witness, the County Prosecutor's Office directed Mr. Cullen to interview this witness. The witness asked why she was being interviewed again. In response to Mr. Cullen's question if she had been previously interviewed, and by whom, the witness indicated that

she had been interviewed by Mr. Brown in her house the day after the incident. This information was included in Mr. Cullen's supplemental report (as "Narrative #6") and downloaded from Mr. Cullen's body cam.

77. Subsequently, Mr. Brown presumably deleted Narrative #6 as well as Mr. Cullen's body cam footage related to this aspect of the assault case and investigation.

78. Another example of Mr. Brown's misconduct that Mr. Cullen and the Sergeant complained about was a public peace complaint that had involved the Sergeant.

79. The original call related to this matter had been handled by the MSP.

80. Mr. Brown showed up on the scene and told the victim to call him, instead of calling the MSP, if another issue occurred.

81. Despite the fact that it should have been retained, Mr. Brown presumably deleted his body cam footage related to this public peace complaint to eliminate records of his involvement and of his direction to the victim.

82. On May 22, 2020, the MSP formally notified Mr. Stelmazek and Ms. Litzner that the MSP was conducting a criminal investigation regarding a City employee without identifying Mr. Brown as the employee.

83. On May 26, 2020, Mr. Stelmazek and Ms. Litzner contacted the MSP on their own initiative and insisted on talking to the MSP "to get out ahead of this". They revealed that they purportedly knew what the investigation was about, namely Mr. Stelmazek's use of a City computer to view certain types of pornography.

84. The MSP said that the criminal investigation was <u>not</u> about this.

85. However, due to what the MSP was told, the MSP followed up almost immediately, obtained search warrants, and ultimately seized some of the City's computers and the City's server records to investigate possible criminal activity by Mr. Stelmazek and/or Mr. Brown.

86. On May 27, 2020, Ms. Litzner and Mr. Paquin (both as a City Councilman and the City's Mayor Pro Tem) met with the MSP about the investigation related to Mr. Brown's misconduct.  They were told few details concerning it, but they were told that Mr. Brown was the subject of the investigation.

87. Also, on May 27, 2020, Mr. Cullen and the Sergeant were interviewed by the MSP about Mr. Brown's misconduct involving the official police records.

88. On May 28, 2020, Mr. Brown was placed on administrative leave.

89. Also, on May 28, 2020, Mr. Stelmazek resigned as the City's City Manager.

90. After Mr. Stelmazek's resignation, a City supervisor employee named Bill Fraser ("Mr. Fraser") became the City's Interim City Manager.

91. Prior to Mr. Brown's administrative leave, Mr. Cullen had never had Freedom of Information Act ("FOIA") requests specifically related to him sent to his employer.

92. After Mr. Brown's administrative leave started, and starting on or about June 2, 2020 and continuing into the Fall of 2020, Ms. Watson and/or the Team of 3 Defendants directed no less than 8 FOIA requests to the City related to Mr. Cullen's personnel records and/or incidents involving Mr. Cullen.

93. Significantly, although Ms. Watson and the Team of 3 Defendants purportedly operated out of Livingston County, they phrased many of their FOIA requests in such a way that showed that they had been told what to ask for by someone who had access to non-public information or by someone who already had certain non-public information.

94. For example, Ms. Watson used an incident number in one FOIA request where such a number would not be known prior to receiving records about the matter.

95. Similarly, in another request, Ms. Watson referred to the name of a woman whose body had been recovered from the Straits of Mackinac in 2019, although the recovered woman's name had not been released and was not used in media reports.

96. On information and belief, such non-public or inside information was provided to Ms. Watson and/or the Team of 3 Defendants by Mr. Brown, Mr. Long, Ms. Litzner, and/or Mr. Strait.

97. Although Mr. Strait was not affiliated with the City in this time-frame, he was a very good friend of Mr. Brown.

98. As a City Police Officer, Mr. Cullen was deputized as a Mackinac County Sheriff's Deputy through the County and Mr. Strait.

99. On May 12, 2020, Mr. Cullen was involved in the arrest of a man who had wrongfully taken a 2 year-old baby and then fled from law enforcement officers in a motor vehicle with the baby still in his possession.  This matter is referred to as the "May 12, 2020 incident".

100. With respect to the apprehension and the arrest of this man, Mr. Cullen had followed appropriate protocols and had followed the directions of the Lieutenant from the Mackinac County Sheriff's Office involved in the matter.

101. Prior to June 23, 2020, there had been no insinuation that Mr. Cullen had done anything wrong with respect to the May 12, 2020 incident.

102. Yet, after Mr. Brown's administrative leave started on May 28, 2020, Ms. Watson and the Team of 3 Defendants made specific FOIA requests regarding the May 12, 2020 incident.

103. On June 23, 2020, the MSP officially delivered its report to the Mackinac County Prosecutor's Office regarding the investigation of Mr. Brown that had arisen due to the complaints of Mr. Cullen and the Sergeant.

104. About 3 hours later on June 23, 2020, Mr. Strait called Mr. Cullen and advised Mr. Cullen that he was rescinding Mr. Cullen's deputization as a Mackinac County Sheriff's Deputy because of the actions Mr. Cullen took during the May 12, 2020 incident.

105. Mr. Strait also sent a letter June 23, 2020 to the same effect as well as directed that an email be sent outlining how Mr. Cullen's police authority was to be limited.

106. On July 13, 2020, Mr. Fraser agreed to drop the unjustified disciplinary actions that Mr. Brown had taken against Mr. Cullen on March 3, 2020.

107. On July 20, 2020, the City's City Council voted 6 to 1 to open an investigation of Mr. Cullen related to why Mr. Strait rescinded Mr. Cullen's deputization.

108. Prior to the vote, the dissenting City Councilman correctly stated that the investigation was a political witch hunt and was against the City Charter.

109. On July 20, 2020, Mr. Cullen was on patrol. As he drove past a house next to Ms. Litzner's house, Mr. Brown's wife jumped up, grabbed her crotch, and flipped off Mr. Cullen.

110. Mr. Cullen reported this inappropriate and disturbing behavior to Mr. Fraser and to the Sergeant who at the time was acting as the Police Chief.

111. On July, 21, 2020, an "attack piece" article was published in a local newspaper regarding the May 12, 2020 incident and Mr. Cullen.  Among other things, this article stated that:

(a) Mr. Strait acknowledged that it was "very unusual" for a deputization to be rescinded, but he made the decision after viewing body camera footage of Mr. Cullen's actions.

(b) Although Mr. Strait refused to specify the nature of any alleged violation or impropriety of Mr. Cullen, Mr. Strait still said:

(i) "I expect certain behavior from officers".

(ii) After reviewing Mr. Cullen's actions, he believes it is in the best interest of the County not to have Mr. Cullen as a deputy.

(iii) "There are standards we have that will not be violated."

(c) Neither the City's Police Department nor the County Sherriff's Office had received any complaints about Mr. Cullen.

(d) No lawsuits had been filed in relation to this matter.

112. On August 18, 2020, Mr. Brown and his wife were driving past Mr. Cullen while he was on-duty and speaking to a youth along the side of the road. They gave Mr. Cullen the middle finger.

113. Mr. Cullen reported this inappropriate and disturbing behavior to Mr. Fraser and to the Sergeant.

114. On August 21, 2020, the Sergeant caught Mr. Brown in his personal vehicle following Mr. Cullen while Mr. Cullen was on patrol.

115. On or about September 3, 2020, Mr. Fraser had completed an internal investigation of Mr. Brown.

116. As a result of his investigation, Mr. Fraser concluded that Mr. Brown should be terminated immediately based on:

(a) Insubordination or disrespect to a superior

(b) Mr. Cullen and the Sergeant's complaint to the MSP

(c) Lack of truthfulness.

117. After Mr. Fraser informed Ms. Litzner of his decision, Ms. Litzner told him he could not terminate Mr. Brown purportedly because the City Council had to approve the decision.

118. Thus, Mr. Fraser did not terminate Mr. Brown.

119. Instead, a few days later, Ms. Litzner and the City Council hired Mr. Long as the new City Manager thereby displacing Mr. Fraser from his role as the Interim City Manager.

120. On September 8, 2020, the City's City Council reinstated Mr. Brown even though (A) the Attorney General's Office had yet to decline to issue criminal charges against Mr. Brown and (B) there were ample reasons to terminate Mr. Brown even if the Attorney General's Office declined to pursue criminal charges.

121. Sometime thereafter, the Michigan Attorney General's Office declined to prosecute Mr. Brown based on the investigation of the complaint Mr. Cullen and the Sergeant made to the MSP.

122. On October 9, 2020, Ms. Watson made a FOIA request for any information/investigations regarding misconduct by Mr. Cullen.

123. Although Kelly Simmons ("Ms. Simmons") was the City's FOIA
Coordinator, Ms. Watson directed this FOIA request to Ms. Simmons, Mr. Long,
Mr. Brown, and Mr. Smith.

124. On October 12, 2020, Ms. Simmons denied the FOIA request relative
to Mr. Cullen because the information was exempt under the FOIA. Specifically,
granting the request would (A) disclose personnel records of a law enforcement
agency and (B) reveal information of a personal nature the public disclosure of
which would constitute a clearly unwarranted invasion of an individual's privacy.

125. Yet, sometime thereafter, Mr. Brown, Mr. Long, and/or Ms. Litzner did
release to Ms. Watson and the Team of 3 Defendants an entire unredacted copy of
Mr. Cullen's personnel record.

126. Among other things, items from 2012 and before were included among
the items that were released.

127. Further, as part of the items released, old investigative records from
2010 were also released ("2010 Records").

128. Although the allegations in the 2010 Records were unfounded and false
to the extent that they had any real bearing on Mr. Cullen's qualifications and
performance, they contained some allegations that portrayed Mr. Cullen in a

particularly negative light with respect to an alleged relationship and the alleged

harassment of a high school senior.

129. Significantly, based on the Bullard-Plawecki Employee Right to Know

Act ("ERKA") these old records should *not* have been part of Mr. Cullen's

personnel record and/or should *not* have been released to Ms. Watson and/or the

Team of 3 Defendants.

130. Plus, to the extent that they contained any disciplinary information, the

City Defendants should have sent Mr. Cullen notice that they were being released

as also required by the ERKA.

131. Instead, the City Defendants violated the ERKA by keeping such

records, by releasing such records, and by failing to provide notice to Mr. Cullen.

132. On November 9, 2020, Mr. Brown confronted Mr. Cullen while Mr.

Cullen was on duty and attending a high school sporting event.

133. Attendance by Police Officers at local sporting events is a very

common practice and is considered part of the community policing.

134. Indeed, Mr. Brown had seen Mr. Cullen do this for a little under 2 years

without expressing any problem with Mr. Cullen doing so.

135. Yet, on this occasion, Mr. Brown told Mr. Cullen he had to leave the

game.

136. Mr. Cullen stated he would leave the game if he was ordered to do so.

137. Eventually, Mr. Brown ordered Mr. Cullen to leave the game; and Mr. Cullen proceeded to follow the order.

138. Presumably, Mr. Brown did not find this entirely satisfying.  Hence, Mr. Brown followed and harassed Mr. Cullen as Mr. Cullen was leaving the high school in order to return to his patrol vehicle.

139. Mr. Cullen turned to face Mr. Brown and they spoke briefly.

140. Mr. Cullen then left the high school and went to his patrol vehicle.

141. Importantly, Mr. Cullen never assaulted Mr. Brown and never battered Mr. Brown at any point during this entire encounter.

142. Despite this, Mr. Brown accused Mr. Cullen of assaulting and/or battering him.

143. Thereafter, Mr. Cullen was suspended with pay.

144. On January 29, 2020, Mr. Long terminated Mr. Cullen's employment with the City based on Mr. Brown's false accusation that Mr. Cullen had assaulted and/or battered Mr. Brown.

145. Prior to Mr. Cullen's termination, the Plaintiffs had entered into an agreement with other investors to obtain a 15% interest in a company known as 2972 W. 8th Street LLC (the "LLC").

146. The LLC was to own and/or operate a cannabis dispensary in the Upper Peninsula of Michigan.

147. This business was and is expected to be extremely profitable.

148. Although the Operating Agreement had not yet been executed by the Plaintiffs and the other investors, it was agreed that the Plaintiffs' investment in the LLC was to be $250,000, with the Plaintiffs to make a $125,000 cash investment and the remaining balance to be "paid" via "sweat equity" in preparing the facilities for use in the business.

149. Based on this agreement to enter into the Operating Agreement, the Plaintiffs paid their $125,000 cash investment to the LLC and started to engage in actions that would count toward the "sweat equity" they were to also invest in the business.

150. After Mr. Cullen was terminated, negative accounts about Mr. Cullen surfaced in the media.

151. Yet, on February 2, 2021, the media accounts got even more negative where they focused on the 2010 Records.

152. Based on the information in the 2010 Records, the Plaintiffs' friend who was also a fellow investor in the LLC told the Plaintiffs that he could not save them in relation to the other investors and their interest in the LLC.

24

153. Thereafter, the other investors in the LLC would not go forward with the Plaintiffs being able to enter into the Operating Agreement.

154. Eventually, they refunded the Plaintiffs' $125,000 cash investment, and considered the Plaintiffs to no longer have any interest in the LLC.

155. The dissemination of the 2010 Records was undertaken by Ms. Watson and/or Mr. Smith on their own and/or through other media contacts.

156. Indeed, the Team of 3 Defendants and/or their proxies contacted individuals affiliated with the LLC, Mrs. Cullen's employer, and/or those with control over Mr. Cullen's employment as the local high school Wrestling Coach.

157. As a result of such contacts and the media accounts, Mr. Cullen was temporarily suspended as the Wrestling Coach.

158. On February 2, 2021, Ms. Watson made two (2) telephone calls to Mr. Cullen after the very negative media accounts focused on the 2010 Records surfaced.

159. During the first call, Ms. Watson actually believed she had called Mr. Long, but she instead had called Mr. Cullen by mistake.

160. During the second call, Ms. Watson correctly believed she had called Mr. Cullen.

161. During the first call, Mr. Cullen went along with the conversation as if he was Mr. Long to learn what was happening.  Ms. Watson did not recognize that she was actually speaking with Mr. Cullen during this first call.

162. During the first call, Ms. Watson made statements showing a common design among the Defendants to act tortiously and/or to act unlawfully or with a unlawful purpose related to the vilification of Mr. Cullen.

163. As part of this, Ms. Watson had the following exchange with Mr. Cullen who she then believed to be Mr. Long:

Ms. Watson: "You said one of these days you're gon, you're gonna owe me big time."

Mr. Cullen as Mr. Long: "Why's that?"

Ms. Watson: "Huh? What do you mean, why is that? Are you kidding me?"

Mr. Cullen as Mr. Long: "Uh, no."

Ms. Watson: "Have you been watching somebody's life implode because they're a piece of shit?"

Mr. Cullen as Mr. Long: "I have not."

Ms. Watson: [Laughs] "What do you mean you have not?"

Mr. Cullen as Mr. Long: "I, I stay away from the news.  What . . . "

Ms. Watson: "Uh huh. Oh my God. I couldn't, I couldn't finish a report quick enough so I sent it to somebody who could."

164. During this first call, Ms. Watson alluded to her "report" or "write-up" a few times.

165. On information and belief, this "report" or "write-up" was a written document or documents that Ms. Watson had provided to the media to smear Mr. Cullen based on or derived from information and/or written materials provided by the non-Team of 3 Defendants.

166. Besides Mr. Long, Ms. Watson referred during this first call to having spoken to Mr. Brown.

167. Ms. Watson also stated that she originally planned to send her report or write-up to "Palmer", namely to the City's City Attorney Charles J. Palmer ["Mr. Palmer"].

168. However, per Ms. Watson, she "didn't go that route", because she purportedly learned of a connection between Mr. Palmer and Mr. Cullen.

169. As such, she felt that Mr. Palmer could not be trusted not to share information with this other person who purportedly was close to both Mr. Palmer and Mr. Cullen.

170. In assessing the job she had done, Ms. Watson alluded to the saying, "The enemy of my enemy is my friend."  Still, she cut the allusion short and said: "So. It is what it is."

171. Ms. Watson also expressed concerns that various types of private information had not been redacted such that the information got into the media accounts where she stated things such as:

(a) "So you guys might get some blowback from that, so just to give you a heads up."

(b) "I thought you'd be pissed."

172. However, Ms. Watson suggested that this could be addressed in part as follows: "You guys submitted stuff to a, to a news agency that got leaked out. Nothing else you can do."

173. Moreover, Ms. Watson offered advice on how the City Defendants could deal with Mr. Cullen's termination, presumably from her "HR days" when she "worked up in administration":  ". . .  it might cost you guys some money on the, on the back end, with the City if you guys choose to settle, but ya know, whatta ya, ya know, you're gonna settle and give him $25,000, fine take your 25, walk, get outta here and try to get a job somewhere else."

174. Shortly after the first call ended, Ms. Watson made her second call to Mr. Cullen.

175. Based on her tone and language, Ms. Watson's purpose for making the second call seemed to be to gloat over the damage she had done to the Plaintiffs, and in particular Mr. Cullen, where the exchange went as follows:

Mr. Cullen: "Yeah."

Ms. Watson: "Question for you."

Mr. Cullen: "Answer for you."

Ms. Watson: "Um, hold on for a second. Do you have a comment for me?"

Mr. Cullen: "Mmm, a comment?"

Ms. Watson: "Yes, a comment."

Mr. Cullen: "I don't think so."

Ms. Watson: "Are you sure?"

Mr. Cullen: "I, I, I am sure."

Ms. Watson: "You positive?"

Mr. Cullen: "Do you have one for me?"

Ms. Watson: "I have lots of 'em for you."

Mr. Cullen: "Ok."

Ms. Watson: "I have lots of questions for you."

Mr. Cullen: "Well, you'll probably never get those answered now."

Ms. Watson: "No, no, no, no, no. You don't have any."

Mr. Cullen: "But, but, I, no."

Ms. Watson: "I'm trying, I'm trying to get them from you."

Mr. Cullen: "But, I, I."

Ms. Watson: "You don't have anything for me?"

Mr. Cullen: "I do thank you for your time."

Ms. Watson: "No, no, no, wait, wait, wait."

[Call ended.]

176. Despite Ms. Watson's suggestion during the first call that the Team of 3 Defendants could be characterized as "a news agency", Ms. Watson's tone and language during both calls shows that Ms. Watson and/or the Team of 3 Defendants were engaged in this matter to do a media hit job on Mr. Cullen and were <u>not</u> acting as "a news agency".

177. Among other things, the following suggest that the Team of 3 Defendants did <u>not</u> constitute a legitimate "new agency" but were instead engaged to destroy Mr. Cullen's reputation in concert with the other Defendants:

(a) Ms. Watson only called Mr. Cullen to gloat after the negative media accounts surfaced about him. She did not contact him to get his side of the story prior to preparing her "report" or "write-up".

(b) News agencies do not run their reports or write-ups past attorneys for organizations they are reporting on. For example, Ms. Watson had no reason to consider sending her "report" or "write-up" to Mr. Palmer unless she was acting in concert with the City Defendants.  Similarly, her concern about whether Mr. Palmer could be trusted to review her "report" or "write-up" only made sense if she was acting in concert with the City Defendants.

(c) For professional journalists, a subject of a report is not an "enemy"; and an "enemy" of a subject is not a friend.

(d) Although a legitimate "new agency" or reporter might on occasion rely on some level of deception to obtain information, it or they would not do so on the scale that the Team of 3 Defendants did. For example, and on information and belief, the Team of 3 Defendants portrayed themselves as the Plaintiffs during an electronic meeting of the City's City Council; held Mr. Smith out as an attorney although he was not an attorney; represented themselves to be a firm although there is no evidence that such a firm existed or exists; represented themselves to have office space, a staff, and a legal team in Brighton, Michigan when in reality

the location is actually "The UPS Store"; used a telephone number that now

appears to be permanently busy; and used online addresses that appear to be fake

and/or to have been ad hoc and temporary.

178. Mr. Cullen's speech, statements, communications, associations, and/or

actions were on or related to matters of public concern as described at paragraphs

30-39, 64-81, 87, 109-110, and 112-113 above.

179. Moreover, by virtue of some of the same speech, statements,

communications, associations, and/or actions, Mr. Cullen did report violations or

suspected violations of law to a public body or public bodies.

180. Mrs. Cullen's speech, statements, communications, associations, and/or

actions were on or related to matters of public concern as described at paragraphs

59-60 above. Further, Mrs. Cullen's association with Mr. Cullen is protected under

the 1st Amendment whether or not it is on or related to matters of public concern.

181. The City Defendants subjected Mr. Cullen to adverse employment

actions, retaliation, and discrimination, including, but not necessary limited to, the

adverse actions described in paragraphs 42, 44, 46, 52, 54-57, 58, 62, 96, 107, 109,

112, 114, 123-131, 132-142, 143, and 144 above. Further, by virtue of a

combination of the above acts and other acts described above, the City Defendants

also subjected Mr. Cullen to retaliatory harassment.

182. The County Defendants subjected Mr. Cullen to adverse employment actions, retaliation, and/or discrimination, including, but not necessarily, limited to, the adverse actions described in paragraphs 96, 104-105, and 111 above.

183. The City Defendants subjected Mrs. Cullen to adverse actions, retaliation, and discrimination, including, but not necessarily limited to, the adverse actions described in paragraphs 59 and 60-61 above.

184. The Defendants subjected the Plaintiffs to the above adverse employment actions and other actions in significant part due to the Plaintiffs' above speech, statements, communications, associations, and/or actions that were on or related to matters of a public concern and/or that were reports of violations or suspected violations of law to a public body or public bodies. Further, the City Defendants also subjected Mrs. Cullen to adverse actions due to her being married to Mr. Cullen.

185. Therefore, the adverse employment actions and other actions taken against the Plaintiffs by the Defendants were contrary to the United States Constitution and the laws of the United States of America and the State of Michigan.

<u>COUNT I: DEPRIVATION OF THE PLAINTIFFS' FEDERAL
CONSTITUTIONAL AND CIVIL RIGHTS AS TO THE CITY DEFENDANTS
AND THE COUNTY DEFENDANTS</u>

186. The Plaintiff incorporates paragraphs 1 through 185 above by reference.

187. This Count is brought pursuant to 42 USC 1983.

188. As noted above, the adverse actions taken against the Plaintiffs by the City Defendants and by the County Defendants were taken by them (A) in their official capacities and (B) under color of state law.

189. The adverse actions stemmed from purposeful discrimination, purposeful retaliation, the City's policy(ies) and/or custom(s), and/or the County's policy(ies) and/or customs.  This includes, but is not necessarily limited to, actions taken by the individual Defendants as (A) the City's final policymaker(s) for purposes of establishing the City's policy(ies) and/or custom(s) and (B) the County's final policymaker(s) for purposes of establishing the County's policy(ies).

190. The adverse actions violated the Plaintiffs' 1st Amendment rights to freedom of association, to freedom of speech and/or expression, and/or to petition government for the redress of grievances in that they were made in significant part due to the Plaintiff's statements, actions, speech, and/or activities that were

protected under the 1st Amendment.

191.   As a direct and proximate result of the Defendants' violations of the Plaintiffs' rights, the Plaintiffs have sustained damages including (but not necessarily limited to) the following:

(a)  Loss of income;

(b)  Loss of fringe benefits;

(c)  Loss of pension and/or Social Security benefits;

(d)  Severe mental anguish and distress;

(e)  Embarrassment and humiliation;

(f)  Mental anguish stemming from the outrage they, and each of them, experienced as a result of the actions against them, and each of them;

(g)  Fright, shock, and mortification;

(h)  Pain and suffering;

(i)  Damage to reputation;

(j) Liquidated damages;

(k) Punitive damages;

(l) All economic and non-economic damages associated with the loss of the interests and opportunities associated with the LLC; and

(m)  Costs and attorney fees.

WHEREFORE, your Plaintiffs respectfully request this Honorable Court to enter a judgment in their favor against the Defendants, jointly and severally, awarding them an amount in excess of One Million ($1,000,000.00) Dollars to which they are entitled for compensatory, exemplary, liquidated, and punitive damages; granting them equitable relief (including removal of improperly retained and/or false information from Mr. Cullen's personnel record and from the City's records); and awarding them costs, interest, and attorney fees so wrongfully incurred.

## COUNT II: VIOLATION OF RIGHTS UNDER THE WHISTLEBLOWERS' PROTECTION ACT AS TO THE CITY DEFENDANTS AND THE COUNTY DEFENDANTS

191. The Plaintiff incorporates paragraphs 1 through 190 above by reference.

192. Under the Whistleblowers' Protection Act ("WPA"), the City Defendants and the County Defendants were and/or are "employers" for all times material to this Complaint.

193. Under the WPA, each City Defendant and each County Defendant was also a "public body" for all times material to this Complaint.

194. Under the WPA, Mr. Cullen was an "employee" for all times material to this Complaint.

195. The adverse actions taken by the Defendants against the Plaintiff as noted above were taken in significant part due to the Plaintiff's report(s) of violations or suspected violations of the law to at least one public body.

196. The Defendants thus violated the WPA.

197. As a direct and proximate result of the Defendants' violations of the Mr. Cullen's rights, Mr. Cullen has sustained damages including (but not necessarily limited to) the following:

    (a)  Loss of income;

    (b)  Loss of fringe benefits;

    (c)  Loss of pension and/or Social Security benefits;

    (d)  Severe mental anguish and distress;

    (e)  Embarrassment and humiliation;

    (f)  Mental anguish stemming from the outrage he experienced as a result of the actions against him;

    (g)  Fright, shock, and mortification;

    (h)  Pain and suffering;

    (i)  Damage to reputation;

    (j) Liquidated damages;

    (k) Punitive damages;

(l) All economic and non-economic damages associated with the loss of the interests and opportunities associated with the LLC; and

(m) Costs and attorney fees.

WHEREFORE, your Plaintiffs respectfully request this Honorable Court to enter a judgment in their favor against the Defendants, jointly and severally, awarding them an amount in excess of One Million ($1,000,000.00) Dollars to which they are entitled for compensatory, exemplary, liquidated, and punitive damages; granting them equitable relief (including removal of improperly retained and/or false information from Mr. Cullen's personnel record and from the City's records); and awarding them costs, interest, and attorney fees so wrongfully incurred.

## COUNT III: VIOLATION OF THE BULLARD-PLAWECKI EMPLOYEE RIGHT TO KNOW ACT AS TO CITY DEFENDANTS

198. The Plaintiff incorporates paragraphs 1 through 197 above by reference.

199. Under the Bullard-Plawecki Employee Right to Know Act ("ERKA"), the City Defendants were and/or are "employers" for all times material to this Complaint.

200. Under the ERKA, Mr. Cullen was an "employee" for all times material to this Complaint.

201. Pursuant to the ERKA, the City Defendants had duties to comply with Sections 6, 7, 8, and 9 of the ERKA, being MCL 423.506, MCL 423.507, MCL 423.508, and MCL 423.509

202. The Defendants violated the ERKA by failing to comply with each of these Sections of the ERKA.

203. On information and belief, the City Defendants willfully and knowingly violated said duties and the ERKA.

204. As a direct and proximate result of the City Defendants' violations of the ERKA, Mr. Cullen has sustained damages including (but not necessarily limited to) the following:

    (a)  Loss of income;

    (b)  Loss of fringe benefits;

    (c)  Loss of pension and/or Social Security benefits;

    (d)  Severe mental anguish and distress;

    (e)  Embarrassment and humiliation;

    (f)  Mental anguish stemming from the outrage he experienced as a result of the actions against him;

    (g)  Fright, shock, and mortification;

    (h)  Pain and suffering;

(i)  Damage to reputation;

(j) Liquidated damages;

(k) Punitive damages;

(m)  Costs and attorney fees;

(n) The $200.00 damages provided in Section 11(b) of the ERKA; and

(o) All economic and non-economic damages associated with the loss of the interests and opportunities associated with the LLC.

WHEREFORE, your Plaintiffs respectfully request this Honorable Court to enter a judgment in their favor against the Defendants, jointly and severally, awarding them an amount in excess of One Million ($1,000,000.00) Dollars to which they are entitled for compensatory, exemplary, liquidated, and punitive damages; granting them equitable relief (including removal of improperly retained and/or false information from Mr. Cullen's personnel record and from the City's records); and awarding them costs, interest, and attorney fees so wrongfully incurred.

## COUNT IV: TORTIOUS INTERFERENCE WITH CONTRACT, BUSINESS RELATIONSHIP, AND/OR EXPECTANCY WITH A THIRD PARTY AS TO ALL INDIVIDUAL CITY DEFENDANTS AND THE TEAM OF THREE DEFENDANTS

205. The Plaintiffs incorporate paragraphs 1 through 204 above by reference.

206. The Plaintiffs had a contract, a business relationship, and/or a business expectancy with one or more third parties related to the LLC.

207. The individual City Defendants and the Team of 3 Defendants had knowledge of the contract, business relationship, and/or business expectancy that the Plaintiffs had with third parties related to the LLC.

208. The individual City Defendants and the Team of 3 Defendants did intentionally and improperly interfere with the Plaintiffs' contract, business relationship, and/or business expectancy that the Plaintiffs had with third parties related to the LLC.

209. When the City Defendants did so interfere, they did so in at least a grossly negligent manner and as such are not entitled to governmental immunity.

210. As a direct and proximate result of the actions of the individual City Defendants and the Team of 3 Defendants, the Plaintiffs have sustained damages including (but not necessarily limited to) the following:

      (a) Loss of income;

      (b) Loss of fringe benefits;

      (c) Loss of pension and/or Social Security benefits;

      (d) Severe mental anguish and distress;

      (e) Embarrassment and humiliation;

(f)  Mental anguish stemming from the outrage they, and each of them, experienced as a result of the actions against them, and each of them;

(g)  Fright, shock, and mortification;

(h)  Pain and suffering;

(i)  Damage to reputation;

(j) Liquidated damages;

(k) Punitive damages;

(l) All economic and non-economic damages associated with the loss of the interests and opportunities associated with the LLC; and

(m)  Costs and attorney fees.

WHEREFORE, your Plaintiffs respectfully request this Honorable Court to enter a judgment in their favor against the Defendants, jointly and severally, awarding them an amount in excess of One Million ($1,000,000.00) Dollars to which they are entitled for compensatory, exemplary, liquidated, and punitive damages; granting them equitable relief (including removal of improperly retained and/or false information from Mr. Cullen's personnel record and from the City's records); and awarding them costs, interest, and attorney fees so wrongfully incurred.

## COUNT V: CIVIL CONSPIRACY AS TO INDIVIDUAL CITY DEFENDANTS, STRAIT, AND TEAM OF 3 DEFENDANTS

211. The Plaintiffs incorporate paragraphs 1 through 210 above by reference.

212. The individual City Defendants, Strait, and/or the Team of 3 Defendants did illegally, maliciously, and/or wrongfully conspire with one another with the intent to and/or for the illegal purpose of retaliating against the Plaintiffs for the exercise of their rights under the United Stated Constitution, for Mr. Cullen's exercise of his rights under the WPA, to violate Mr. Cullen's rights under the ERKA, and/or to tortiously interfere with the Plaintiffs' contract, business relationship, and/or business expectancy related to the LLC.

213. The individual City Defendants, Strait, and/or the Team of 3 Defendants did indeed carry out actions together and in combination with each other to accomplish these purposes. As to the individual City Defendants and Strait, these actions were undertaken in an at least grossly negligent manner and as such they are not entitled to governmental immunity.

214. The individual City Defendants, Strait, and/or the Team of 3 Defendants knew of or at least acquiesced in these underlying actions.

215. This conspiracy resulted in the illegal, unlawful, or tortious activities of violating the Plaintiffs' rights under the United States Constitution, violating Mr.

Cullen's rights under the WPA, violating Mr. Cullen's rights under the ERKA, and/or tortiously interfering with the Plaintiffs' contract, business relationship, and/or business expectancy related to the LLC.

216. As a result of the conspiracy and the Defendants' illegal, wrongful, or tortious acts, the Plaintiffs have sustained damages including (but not necessarily limited to) the following:

(a)  Loss of income;

(b)  Loss of fringe benefits;

(c)  Loss of pension and/or Social Security benefits;

(d)  Severe mental anguish and distress;

(e)  Embarrassment and humiliation;

(f)  Mental anguish stemming from the outrage they, and each of them, experienced as a result of the actions against them, and each of them;

(g)  Fright, shock, and mortification;

(h)  Pain and suffering;

(i)  Damage to reputation;

(j) Liquidated damages;

(k) Punitive damages;

(l) All economic and non-economic damages associated with the loss of the interests and opportunities associated with the LLC; and

(m)  Costs and attorney fees.

WHEREFORE, your Plaintiffs respectfully request this Honorable Court to enter a judgment in their favor against the Defendants, jointly and severally, awarding them an amount in excess of One Million ($1,000,000.00) Dollars to which they are entitled for compensatory, exemplary, liquidated, and punitive damages; granting them equitable relief (including removal of improperly retained and/or false information from Mr. Cullen's personnel record and from the City's records); and awarding them costs, interest, and attorney fees so wrongfully incurred.

### COUNT VI: CONCERT OF ACTION AS TO INDIVIDUAL CITY DEFENDANTS, STRAIT, AND TEAM OF 3 DEFENDANTS

217. The Plaintiffs incorporate paragraphs 1 through 216 above by reference.

218. The individual City Defendants, Strait, and the Team of 3 Defendants engaged in concerted activities as described above by express or implied agreement and with the common designs as described above.

219. The Plaintiffs may not be able to identify all the relevant Defendant's activities due to the generic similarity of such activities as promoted by the relevant Defendants.

220. As to the individual City Defendants and Strait, these activities were undertaken in an at least grossly negligent manner and as such they are not entitled to governmental immunity.

221. Due to the concert of action among the relevant Defendants, each is liable to the Plaintiffs for their injuries even if there was no direct relation to the activity conducted by that Defendant.

222. As a result of the concert of action and the Defendant's wrongful activities, the Plaintiffs have sustained damages including (but not necessarily limited to) the following:

> (a)  Loss of income;
>
> (b)  Loss of fringe benefits;
>
> (c)  Loss of pension and/or Social Security benefits;
>
> (d)  Severe mental anguish and distress;
>
> (e)  Embarrassment and humiliation;
>
> (f)  Mental anguish stemming from the outrage they, and each of

them, experienced as a result of the actions against them, and each of them;

(g)  Fright, shock, and mortification;

(h)  Pain and suffering;

(i)  Damage to reputation;

(j) Liquidated damages;

(k) Punitive damages;

(l) All economic and non-economic damages associated with the loss of the interests and opportunities associated with the LLC; and

(m)  Costs and attorney fees.

WHEREFORE, your Plaintiffs respectfully request this Honorable Court to enter a judgment in their favor against the Defendants, jointly and severally, awarding them an amount in excess of One Million ($1,000,000.00) Dollars to which they are entitled for compensatory, exemplary, liquidated, and punitive damages; granting them equitable relief (including removal of improperly retained and/or false information from Mr. Cullen's personnel record and from the City's records); and awarding them costs, interest, and attorney fees so wrongfully incurred.

DEMAND FOR TRIAL BY JURY IS HEREBY MADE.

DATED: April 19, 2021          /s/ GARY T. MIOTKE_____
                                GARY T. MIOTKE (P41813)
                                Attorney for Plaintiff
                                6828 Park Avenue

Allen Park, MI 48101
(313)-388-4809
gmiotke@miotkelawoffice.com