UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RICHARD M. CULLEN,
MARY C. CULLEN,

      Plaintiffs,                                    Case No. 2:21-cv-76

v.                                              Hon. Hala Y. Jarbou

CITY OF ST. IGNACE, et al.,

      Defendants.
_____/

## OPINION

Plaintiffs Richard Cullen and his wife, Mary Cullen, bring this case against the City of St. Ignace, the County of Mackinac, Chief of Police Anthony Brown, City Manager Darcy Long, Mayor Constance Litzner, Sheriff Scott Strait, and Caryn Marie Michalak, asserting various claims under federal and state law. Before the Court is a motion for judgment on the pleadings or for summary judgment by Defendant Litzner (ECF No. 80), a motion for summary judgment by Defendants Brown and Long (ECF No. 91), a motion for summary judgment by Defendants City of St. Ignace and Long (ECF No. 93), a motion for dismissal or for summary judgment by Defendant Michalak (ECF No. 99), and a motion for partial summary judgment by Plaintiffs against the City and Long on Count III of the amended complaint (ECF No. 103). Defendants County of Mackinac and Strait have apparently settled their claims with Plaintiffs. (*See* Rep. of Facilitative Mediation, ECF No. 119.) For the reasons herein, the Court will grant the motions by Litzner and Michalak, dismissing them from the case. The Court will grant the motions by the City, Brown, and Long, in part. And the Court will grant Plaintiffs' motion, in part.

# I. BACKGROUND

Plaintiff Richard Cullen (hereinafter, "Cullen") began working for the City of St. Ignace as a Police Officer in April 2008. (10/14/2022 Cullen Decl. ¶ 3, ECF No. 107-2.)[1] He continued working for the City in that position until it terminated him on January 29, 2021. (*Id.*) In short, he contends that Long, the City Manager at the time, terminated him in retaliation for his protected conduct, including a complaint that he filed about misconduct by Brown, the City's Chief of Police. Both Plaintiffs contend that Defendants retaliated against them, or conspired to retaliate against him, in various ways before Cullen's termination.

## A. Brown Becomes Police Chief

Brown became Chief of Police in February 2019. (Brown Dep. 40, ECF No. 92-1.) According to Cullen, after June 30, 2019, Brown subjected Cullen to a "series" of what Cullen describes as "disciplinary actions." (10/14/2022 Cullen Decl. ¶ 5.) These actions started after Cullen issued a citation to a City Councilman. (*Id.*) The Councilman had committed the same offense on previous occasions. (*Id.*) Brown "criticized" Cullen for issuing the citation, telling Cullen that he should have shown the Councilman a "professional courtesy" instead of issuing the citation. (*Id.*) Cullen disagreed and did not dismiss the citation. (*Id.*)

Cullen alleges other disciplinary actions by Brown occurring in July 2019, January 2020, February 2020, and March 2020 (Am. Compl. 6-8, ECF No. 23.), but Cullen provides no evidence to support these allegations, so the Court will not discuss them here.

---

[1] Defendants ask the Court to strike Cullen's declaration in its entirety because it contains legal conclusions and other inadmissible statements, which by themselves do not suffice to create a genuine dispute of material fact. *See Sigmon v. Appalachian Coal Props.*, 400 F. App'x 43, 48-49 (6th Cir. 2010) ("While an affidavit may certainly be sufficient to establish a genuine issue of material fact, that is not the case if the affidavit contains only conclusory allegations and naked conclusions of law.") (citation omitted). The Court declines to strike the entire affidavit because the Court can distinguish the proper averments of fact from the conclusory statements, hearsay, and averments not based on personal knowledge. The Court will disregard the inadmissible statements when relying on the declaration as evidence to support Plaintiffs' claims.

### B. Brown Allegedly "Stalks" Mary Cullen

Plaintiffs allege that Brown "stalked" Mary Cullen on February 19, 2020. (Am. Compl. ¶ 60.) In her deposition, Mary Cullen clarified that Brown saw her pulling out of her driveway as he was pulling into the driveway of the sheriff's department. (M. Cullen Dep. 47-48, ECF No. 92-11.) (Plaintiffs' home is visible from the driveway to the sheriff's department.) Brown then backed out into the street and stayed there. (*Id.* at 47.) He "stared [her] down" as she drove past him. (*Id.*) She allegedly made an "in-person" complaint about Brown's conduct to Mike Stelmazek, who was the City Manager at the time. (Am. Compl. ¶ 61.) On February 24, 2020, Stelmazek allegedly informed her by letter that he would not take any action against Brown. (*Id.* ¶ 62.)

### C. Cullen Files a Complaint about Police Chief Brown

Sometime before May 8, 2020, Cullen was looking for police records about an individual with "significant mental health issues." (10/14/2022 Cullen Decl. ¶ 7.) He contends that he discovered evidence that Brown had altered police records about an incident involving a suicidal individual, in order to suggest that a different individual was involved. (*Id.* ¶¶ 8-10.) Cullen brought this information to his union, which advised him to report the matter to the Michigan State Police ("MSP"). (*Id.* ¶¶ 11-12.) On May 19, 2020, Cullen and the City's Police Sergeant, Allen Mitchell, filed a written complaint about Brown's conduct with the MSP ("MSP complaint"). (*Id.* ¶ 15; *see* MSP compl., ECF No. 92-4.) The complaint also alleged that Brown had destroyed police reports and/or bodycam video that ostensibly "implicated" Brown in other "wrongful acts." (*Id.* ¶ 16; MSP compl., PageID.698.)

### D. The City Places Brown on Leave While He is Investigated

After Cullen filed his complaint, the MSP investigated Brown. The City put Brown on administrative leave on May 27 or 28, 2020, pending the results of the investigation. (10/14/2022

Cullen Decl. ¶ 18.)  Mackinac County Sheriff Scott Strait told Brown that Cullen had initiated the investigation.  (Text Messages, ECF No. 107-4, PageID.1428.)  Strait told Brown, "Keep the faith.  This too, shall pass."  (*Id.*, PageID.1429.)  Brown responded, "It can't just pass.  I have to come out [on] top of this."  (*Id.*)

Some residents of the City were not pleased with Brown's suspension.  Brown's wife allegedly "flipped off" Cullen on July 20, 2020, while he was on patrol.  (Am. Compl. ¶ 110.)  Also, Defendant Michalak called Brown using an app that disguised her voice in order to tell him that he was "in a shitty situation" and that she was "sorry [he was] in it."  (Brown Dep. 194-95, ECF No. 109-4.)  She eventually became friends with Brown, calling him up to ten times per day during his suspension.  (Michalak Dep. 76-77, ECF No. 109-6.)

Around the time that Brown's suspension began, Stelmazek resigned as City Manager and Bill Fraser became the Interim City Manager.  While the MSP conducted its investigation, Fraser conducted his own investigation into Brown.  By September 2020, Fraser concluded that he should terminate Brown.  On September 3, 2020, Fraser prepared a memorandum for the City Council outlining his reasons for terminating Brown.  (*See* Fraser Email, ECF No. 116-12, PageID.1828-1830; Fraser Dep. 30, ECF No. 81-4.)  He then met with Mayor Litzner to discuss the issue.  She informed him that he did not have authority to fire Brown without approval from the City Council.  (Litzner Aff. ¶¶ 4-5, ECF No. 81-1; Fraser Dep. 30-31.)  After reviewing the City's charter, Fraser agreed with her assessment; consequently, Fraser did not pursue the matter.  (Fraser Dep. 31, 54.)  A few days later, Defendant Long took over as the City Manager.  (*Id.* at 31.)

In mid-September 2020, the MSP told the City that there was insufficient evidence of illegal activity to pursue charges against Brown.  (Litzner Dep. 105-08, ECF No. 92-5.)  The City then reinstated him to his position.  (*Id.* at 107.)  After the news media reported these

developments, Brown posted a comment on Facebook, saying, "Let the 'clutch' move to phase 3."
(Brown Facebook Post, ECF No. 116-13, PageID.1847.)

### E. Cullen Urges Long to Take Action Against Brown

After Brown's reinstatement, Fraser and Cullen met with Long and urged him to "take
action" against Brown.  (Long Dep. 84, 197, ECF Nos. 92-6, 109-3.)  Cullen said to Long, "[I]f
you don't take care of this matter you won't be here very long."  (*Id.* at 84.)  Cullen also said that
he would not follow Brown's orders.  (*Id.* at 197.)

### F. Sheriff Strait Revokes Cullen's Deputization for Mackinac County

In addition to Cullen's position as a police officer for the City, he had been deputized to
serve as an officer for Mackinac County, where St. Ignace is located.  On May 12, 2020, Cullen
arrested a man named Cody Blakely, who had fled from law enforcement.  (Cullen Decl. ¶ 14; Use
of Force Report, ECF No. 100-10.)  After reviewing bodycam footage of Blakely's arrest, Sheriff
Strait concluded that Cullen had not been truthful in his description of the force that he used on
Blakely when making the arrest.  (Strait Dep. 44, ECF No. 109-9.)  Cullen reported that he had
used an "arm bar" restraint, but Strait determined that Cullen had choked Blakely because Cullen
said as much during the arrest.  (*Id.* at 45, 52-53.)  Strait believed that Cullen's use of force was
unreasonable.  (*Id.* at 52.)  Consequently, Strait made the decision to revoke Cullen's deputization.
(*Id.* at 102.)  Strait informed Cullen of this decision on June 23, 2020.  (*Id.* at 20.)  As a result,
Cullen could not act as a police officer outside the City.

### G. The City Discloses Information about Cullen in Response to FOIA Requests

In the fall of 2020, the City received multiple requests for information under Michigan's
Freedom of Information of Act (FOIA) from Michalak, who used the names Melissa Watson and
Phil Smith to conceal her identity.  Some of those requests concerned Cullen's background,
including one on October 9, 2020, that asked for "information/investigations regarding any sexual

misconduct or allegations with" Cullen.   (*See* 10/9/2020 Watson Email, ECF No. 92-12, PageID.770.)   The City's FOIA Coordinator, Kelly Simmons, responded to this request. (10/12/2020 Simmons Email, ECF No. 92-12, PageID.771.)  She denied it for two reasons:  (1) it requested information "of a personal nature" that if disclosed to the public "would constitute a clearly unwarranted invasion of an individual's privacy"; and (2) it would require disclosure of the "personnel records of law enforcement agencies."  (*Id.*)   These categories of information are generally exempt from disclosure under Michigan's FOIA.  *See* Mich. Comp. Laws § 15.243(1). Personnel records of law enforcement agencies are exempt "[u]nless the public interest in disclosure outweighs the public interest in nondisclosure in the particular instance[.]"  Mich. Comp. Laws § 15.243(1)(s).

Michalak appealed Simmons's decision, and City Manager Long overturned it on October 21, 2020, providing Michalak with several redacted documents about Cullen.  (10/21/2020 Long Email, ECF No. 92-12, PageID.775.)  Long concluded that the disclosure of these documents did "not violate the release of employment records."  (*Id.*)

The documents released to Michalak concerned citizen complaints about Cullen from 2009 and 2010.  (*See* ECF No. 103-4.)  One document was a letter to the police department from a woman who alleged that Cullen had a sexual relationship with her seventeen-year-old daughter in May 2009.  (*Id.*, PageID.1281-1282.)  The other documents summarized the investigation of a complaint from a woman who alleged that Cullen had harassed her teenage daughter, stopping her on multiple occasions for minor violations, insulting her on Facebook, and making sexual remarks about her.  (*Id.*, PageID.1266-1276.)  According to the investigation report, Cullen admitted to referring to the teenage girl as "Schrek" and a "Fucking bitch."  (*Id.*, PageID.1276.)  The investigation concluded that Cullen's behavior "although not criminal in nature is without a doubt

in violation of the department[']s policies and procedures[.]" (*Id.*)  Michalak gave these documents

to the local news media.  (Michalak Dep. 105, ECF No. 103-3.)

Cullen avers that these documents contained allegations that were "unfounded" and that

unfairly portrayed him in a negative light, harming his reputation.  (10/14/2022 Cullen Decl. ¶ 40.)

**H. Cullen Has an Altercation with Chief Brown**

Sometime before November 9, 2020, Chief Brown informed his officers that they should

not be present at the LaSalle High School while on duty because it is outside the City's jurisdiction.

(Brown Dep. 165.)  Officers often attended events at the school, but Brown determined that it was

not appropriate for them to do so while on duty.  (*Id.*)  That evening, Brown saw Cullen at a

basketball game at the school while Cullen was on duty.  Cullen acknowledges that he was not

authorized to be there.  (Cullen Dep. 123, ECF No. 92-3.)  Brown asked Cullen to step into the

hallway.  (Brown Dep. 165; Cullen Dep. 123.)  While in the hallway, Brown told Cullen he could

not be there because he was outside the city limits; Brown said he had sent out an email telling

officers "you can't be out of the city limits unless you contact . . . your immediate supervisor."

(Cullen Dep. 124.)  Cullen acknowledged receiving that email.  (*Id.*)  Brown reiterated that Cullen

could not be there.  (*Id.*)  Cullen responded, "Why can't I be here?"  (*Id.*)  Brown said, "Because I

just told you."  (*Id.*)  Cullen argued that the email said "if you get called outside the city limits you

have to let them know," and he was not called outside the city limits; rather, he decided to watch

the basketball game.  (*Id.*)  Brown again told Cullen he was not allowed to be there; he had to

leave.  (*Id.*)  Cullen responded, "'And if I don't?'"  (*Id.*)  Cullen said he would leave if Brown

ordered him to do so.  Brown said, "You can't be here."  (*Id.*)  Cullen again said that he would

leave if Brown ordered him to do so.  At that point, Brown ordered Cullen to leave, and Cullen

left, giving a "little snicker" as he did so.  (*Id.* at 125-26.)

After Cullen left, Brown called City Manager Long, and they discussed Cullen's behavior at the high school.  (Brown Aff. ¶ 2, ECF No. 92-7.)  Among other things, Brown told Long that Cullen had given him a "chest bump" and stepped on his foot during their altercation.  (Long Dep. 156, ECF No. 92-6.)  Cullen, however, denies having any physical contact with Brown during their confrontation.  (Cullen Dep. 125, 127.)  Later that evening, Brown contacted Cullen and asked him to come into the office.  (*Id.* at 130.)  At the office, Long put Cullen on paid leave pending the results of an investigation into "insubordination" by Cullen earlier that evening.  (*Id.* at 131.)

### I. The City Investigates Cullen's Conduct

The City hired Colby Investigations to conduct an independent investigation into Cullen's actions toward Brown on November 9, 2020.  The City also asked Colby to investigate an incident from July 2020 involving Cullen and a City resident, Cheryl Lavake.  Lavake posted the details of this incident on her Facebook account.  According to Lavake, while her grandson was driving her through the City, a dark-colored Suburban pulled in front of them and they almost collided with it.  (Lavake Dep. 6, ECF No. 92-9.)  Moments later, her grandson suggested that they pull over into a parking lot because the Suburban had turned around and was speeding toward them.  (*Id.* at 7.)  They parked their vehicle and then the Suburban pulled up next to them.  The driver of the Suburban got out of his vehicle and "scream[ed]" at Lavake's grandson, asking, "Do you know how f-ing fast you were going[?]"  (*Id.*)  Lavake's grandson replied, "Yes I do.  I was going 27."  (*Id.*)  The other driver threatened Lavake's grandson, saying, "I'll break your fucking hands off at the wrist and I'll shove them up your ass."  (*Id.*)  Lavake got out and confronted the other driver.  He called her "just an old lady" and then left.  (*Id.* at 8.)  Lavake was able to take a picture of the back of the other vehicle.  One of her family members recognized the vehicle as one belonging to

Cullen.  (*Id.* at 10.)  In her Facebook post, Lavake indicated that the other driver might be a police officer.  (*Id.* at 11.)  Lavake's grandson reported the incident to the City.

Colby prepared a report summarizing the findings of its investigation.  (*See* Colby Rep., ECF No. 92-8.)  It found that Cullen was "disrespectful, confrontational and impertinent" toward Brown and disregarded several clear orders by Brown to leave the high school on November 9, 2020.  (*Id.*, PageID.737.)  Further, Colby noted that Cullen had previously told City Manager Long that "he was not going to follow the Chief's orders."  (*Id.*)  And when shown a document Cullen had signed saying that he would follow the City's policies, Cullen claimed that he told Brown that he refused to sign that document.  (*Id.,* PageID.737-738.)  Cullen also claimed that he told other officers to refuse to sign that document.  (*Id.*, PageID.738.)  Accordingly, Colby concluded that Cullen had been insubordinate.  (*Id.*)

After reviewing video footage from the high school hallway, Colby could not confirm that Cullen chest-bumped Brown or stepped on his toe because "the camera angle does not provide a view" that would show that contact.  (*Id.*, PageID.740.)  However, it found that Cullen assaulted Brown when, before Cullen exited the school, he turned back around to "confront" Brown, causing Brown to put his hands up in self-defense.  (*Id.*)

Colby also found that Cullen engaged in conduct "unbecoming to an officer" in his interaction with Lavake and her grandson.  (*Id.*, PageID.739.)  According to Colby, Lavake confirmed that Cullen was the individual who threatened her grandson.  (*Id.*, PageID.732.)  When asked about the incident, Cullen denied any involvement; however, Colby concluded that Cullen was not telling the truth.  (*Id.*, PageID.739.)

The City also held a "predetermination hearing" about Cullen's conduct but Cullen did not attend the hearing because his union advised him not to do so.  (Cullen Dep. 133.)

**J. The City Terminates Cullen**

Long reviewed Colby's report and decided to terminate Cullen based on the evidence from that investigation.  (*See* Long Dep. 163.)  Long sent Cullen a letter dated January 29, 2021, explaining his reasons for the termination.  (Termination Letter, ECF No. 92-10.)  The letter cited the City's policies regarding police officer conduct "on and off duty," obeying orders, and insubordination.  (*Id.*, PageID.760-761.)  It also quoted the provisions of the Michigan criminal code regarding assault.  (*Id.*, PageID.761.)  The letter then summarized the City's reasons as follows:

> In reviewing the information produced in the investigation and in observing your statements and actions, it has become clear that you are not performing to departmental standards while consciously and intentionally engaging in assaultive conduct, flaunting disdain for the authority of the Chief and others, including telling others that you would not follow the Chief's orders and then following through on that insubordinate promise, violating work rules and policy without regard for the effect on the department, other officers and more importantly the people and community we serve.

(*Id.*, PageID.761-762.)

Apparently, the news media discussed Cullen's termination in news reports in January and February 2021.  In particular, an article in the Detroit free Press dated February 1, 2021, stated that the City had terminated Cullen for "allegedly getting in a physical altercation with the police chief."  (2/1/2021 Detroit Free Press article, ECF No. 109-8.)  It also discussed a "threatening remark" that Cullen had posted on Facebook after his termination.  The article quoted Cullen's post as stating that he "learned more" in his deployment to Afghanistan than he did "the entire 20 year duration of [his] now quasi closed Law Enforcement career."  (*Id.*, PageID.958.)  Cullen's post then stated, "There's no doubt I will call those lessons back into service as I enter a new Jihad against my oppugnant. [sic] #thinbluelinestrong #imcomingforyou."  (*Id.*)  The article also

reported that Defendants Litzner and Brown believed that "some city officials and residents perceive the post as a threat."  (*Id.*)

### K. Michalak Contacts Cullen

The next day, Michalak called Cullen two times.  (11/23/2022 Cullen Decl. ¶ 59, ECF No. 116-2.)  Cullen believes that the first time Michalak called him, she thought she had called Long.  (*Id.* ¶ 60.)  He "went along" with the conversation.  (*Id.* ¶ 62.)  They had the following exchange:

> Michalak:  "You said one of these days you're gon, you're gonna owe me big time."
>
> Cullen:  "Why's that?"
>
> Michalak:  "Huh?  What do you mean, why is that?  Are you kidding me?"
>
> Cullen:  "Uh, no."
>
> Michalak:  "Have you been watching somebody's life implode because they're a piece of shit?"
>
> Cullen:  "I have not."
>
> Michalak:  [Laughs]  "What do you mean you have not?"
>
> Cullen:  "I, I stay away from the news.  What . . . ."
>
> Michalak:  "Uh huh.  Oh my God.  I couldn't, I couldn't finish a report quick enough so I sent it to somebody who could."

(*Id.* ¶ 64.)

Michalak alluded to a "report" or "write-up" several times and to a previous call with Brown.  (*Id.* ¶¶ 65-66.)  She said she initially intended to send the report to the City Attorney but she did not trust the City Attorney because he had a personal connection with Cullen.  She also expressed concern that some "private information had not been redacted such that the information got into the media accounts[.]"  (*Id.* ¶ 68.)  She said, "So you guys might get some blowback from that, so just to give you a heads up."  (*Id.*)  She suggested that the City could respond by saying

11

that it "submitted stuff to a, to a news agency that got leaked out.  Nothing else you can do."  (*Id.*)

Michalak also purportedly advised that the City's termination of Cullen could "cost [the City]

some money . . . on the back end," if it chose to settle with him.  (*Id.* ¶ 69.)

After that call ended, Michalak called Cullen again.  This time, she apparently knew that

she was speaking with Cullen.  She asked him several times if he had "a comment for [her]."  (*Id.*

¶ 70.)  He did not provide one.  (*Id.*)

### L. Plaintiffs Lose an Investment Opportunity

Cullen says that some of the news reporting discussed the citizen complaints about him

that the City had released to Michalak.  (11/23/2022 Cullen Decl. ¶ 53.)  Plaintiffs allege that the

disclosure of these complaints caused Plaintiffs to "lose out on what could have been an excellent

investment and employment opportunity related to a cannabis dispensary in the Upper Peninsula."

(Am. Compl. ¶ 53.)   Plaintiffs had allegedly entered an agreement to obtain an interest in a

company that would own or operate a cannabis dispensary, and they allegedly paid $125,000 in

connection with that agreement.  (*Id.* ¶¶ 147, 150.)  According to Plaintiffs, the other investors

decided not to continue their venture with Plaintiffs due to these news reports.  Consequently, the

investors refunded Plaintiffs' investment.  (*Id.* ¶ 155.)

## II. CLAIMS

Based on the facts above, Plaintiffs assert the following claims against Defendants:

violation of Plaintiffs' rights under the First Amendment (Count I); violation of Michigan's

Whistleblowers' Protection Act (WPA), Mich. Comp. Laws § 15.361 et seq. (Count II); violation

of Michigan's Bullard-Plawecki Employee Right to Know Act (ERKA), Mich. Comp. Laws

§ 423.501 et seq. (Count III); tortious interference with a contract, business relationship, or

business expectancy (Count IV); civil conspiracy to violate Plaintiffs' rights under federal and

state law (Count V); and concert of action (Count VI).

### III. JUDGMENT ON THE PLEADINGS STANDARD

"For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007).  A motion for judgment on the pleadings is subject to the same review standard as a motion to dismiss under Rule 12(b)(6). *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 611 (6th Cir. 2012).  To survive the motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Merely pleading facts that are consistent with a defendant's liability or that permit the court to infer misconduct is insufficient to constitute a plausible claim." *HDC*, 675 F.3d at 611.  Additionally, the Court "'need not accept as true legal conclusions or unwarranted factual inferences.'" *Id.* (quoting *Kottmyer v. Maas*, 436 F.3d 684, 689 (6th Cir. 2006)).

Assessment of the complaint must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56.  *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010).  "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### IV. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must determine "whether the evidence presents a sufficient disagreement to

13

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.* at 249.  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).  "This standard of review remains the same for reviewing cross-motions for summary judgment." *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 441 (6th Cir. 2021).  "[A] case involving cross-motions for summary judgment requires 'evaluat[ing] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" *Id.* at 442 (quoting *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019)).

## V. COUNT I: RETALIATION

Plaintiffs claim that the City and Defendants Brown, Long, and Litzner retaliated against them for exercising their rights under the First Amendment "to freedom of association, to freedom of speech and/or expression, and/or to petition government for the redress of grievances[.]"  (Am. Compl. ¶ 191.)  "'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected [conduct]." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).  To prevail on their claim, Plaintiffs must show that:  "(1) [they] engaged in protected conduct; (2) the defendants took an adverse action against [them]; and (3) a causal connection exists between the two." *Rudd v. City of Norton Shores*, 977 F.3d 503, 513 (6th Cir. 2020).  The causal connection requires a showing that "the adverse action was motivated at least in part by [Plaintiffs'] protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999).

The Court uses a "burden-shifting framework to analyze motive for retaliation claims." *Bey v. Hissong*, No. 21-2883, 2022 WL 3969831, at *4 (6th Cir. Apr. 19, 2022).  Plaintiffs have the initial burden to "establish that [their] protected conduct was a motivating factor behind" the adverse action. *Thaddeus-X*, 175 F.3d at 399.  If they meet this burden, "the burden of production shifts to the defendant." *Id.*  "If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment." *Id.*  "A defendant must make this showing by a preponderance of the evidence." *Maben v. Thelen*, 887 F.3d 252, 262 (6th Cir. 2018).

### A. Chief Brown & City Manager Long

Plaintiffs apparently rely on the following actions as the basis for their retaliation claims against Defendants Brown, Long, and the City:  (1) Brown "stalked" Mary Cullen; (2) Brown disciplined Cullen in various ways before May 2020; (3) Long released information about Cullen to Michalak; (4) Brown falsely reported that Cullen had chest-bumped him and stepped on his toe at the high school, causing Long to suspend Cullen; and (5) Long terminated Cullen.

Defendant Long contends that, to the extent Cullen challenges any adverse *employment* actions, the Court must apply a substantive due process analysis under the Fourteenth Amendment because "defendant's behavior cannot be evaluated under any other amendment."  (Defs.' Brown & Long's Br., ECF No. 92, PageID.654.)

No authority supports Defendants' argument.  In *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court instructed courts to rely on the "explicit textual source of constitutional protection against . . . government conduct," rather than the "more generalized notion of 'substantive due process[.]'"  *Id.* at 395.   The First Amendment is the explicit textual source of protection against government retaliation for exercising freedom of speech or engaging in other conduct protected by that amendment, even where the plaintiff is a government employee alleging

an adverse employment action.  *See Handy-Clay v. City of Memphis*, 695 F.3d 531, 547-48 (6th Cir. 2012).  Accordingly, the Court will apply the retaliation standard discussed above.

### 1. Mary Cullen

Defendants Brown and Long seek summary judgment on all claims asserted by Cullen's wife, Mary Cullen.  For Plaintiffs' retaliation claim, the only possible incident at issue involving Mary Cullen stems from Plaintiffs' allegation that Brown "stalked" Mary Cullen on February 19, 2020.  (Am. Compl. ¶ 60.)  Brown saw her pulling out of her driveway as he was pulling into the driveway of the sheriff's department.  Brown then backed his car out into the street and stayed there.  He "stared her down" as she drove past him.

Defendants rightly note that Brown's conduct does not give rise to a First Amendment claim.  It does not satisfy the second element of a retaliation claim, which is an adverse action.  An adverse action is "one that is '*capable* of deterring a person of ordinary firmness' from exercising the constitutional right in question."  *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (quoting *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002)).  This is not a difficult standard to meet; it is "intended to weed out only inconsequential actions[.]"  *Thaddeus-X*, 175 F.3d at 398.  But even accounting for the "reduced" standard of "ordinary firmness" that applies to ordinary citizens rather than prisoners, *see Rudd*, 977 F.3d at 514, a reasonable jury could not conclude that Brown's "stare down" was sufficiently adverse to constitute an adverse action.  Staring at another person in a public place is inconsequential, even where the defendant is a police officer and the plaintiff is a private citizen.  Holding otherwise would "trivialize the First Amendment."  *See Thaddeus-X*, 175 F.3d at 397 (citation omitted).  Accordingly, Defendants are entitled to summary judgment for any retaliation claim based on Brown's "stalking" of, or staring at, Mary Cullen.

Plaintiffs have not demonstrated any other retaliatory conduct by Defendants toward Mary Cullen.  She cannot assert a federal claim against Defendants for retaliatory actions taken toward

Cullen, her husband.  She does not have standing to assert a claim for a violation of Cullen's constitutional rights.  *See Claybrook v. Birchwell*, 199 F.3d 350, 358 n.9 (6th Cir. 2000) (husband lacked standing for indirect injuries caused by constitutional tort against wife).  "[A] § 1983 claim is 'entirely personal to the direct victim of the alleged constitutional tort.'"  *Barber v. Overton*, 496 F.3d 449, 457 (6th Cir. 2007) (quoting *Claybrook*, 199 F.3d at 357).

Mary Cullen apparently relies on the right to "freedom of association" as support for a retaliation claim based on her marriage relationship to Cullen; however, no evidence suggests that any Defendant took any action against either of them because they were in a marriage relationship, as in *Adkins v. Board of Education of Magoffin County*, 982 F.2d 952 (6th Cir. 1993).  Accordingly, the Court will dismiss Mary Cullen's federal claim in Count I.

### 2. Richard Cullen

Cullen's retaliation claim relies on other facts.

### (a) Cullen's Protected Conduct

MSP complaint.  For purposes of Defendants' present motions, Defendants Brown and Long do not contest that the MSP complaint is protected conduct.  (Defs. Brown & Long's Br., ECF No. 92, PageID.644.)

Discussion with Long.  As indicated above, Cullen urged Long to "take action" against Brown and said that he would not follow Brown's orders.  Defendants argue that these actions are not protected conduct, citing *Graziosi v. City of Greenville*, 775 F.3d 731 (5th Cir. 2015). Alternatively, Defendants argue that they could respond to such conduct without violating Cullen's First Amendment rights.  The Court agrees.

In *Graziosi*, the Court of Appeals for the Fifth Circuit noted that the speech of a public employee is protected if it survives the "two-step inquiry" in *Garcetti v. Ceballos*, 547 U.S. 410 (2006) and *Lane v. Franks*, 573 U.S. 228 (2014).  *Graziosi*, 775 F.3d at 736.  "Under *Lane*, [the

Court] must determine whether the employee spoke as a citizen on a matter of public concern, and, if so, whether the relevant government entity had an adequate justification for treating the employee differently than other members of the general public." *Howard v. Livingston Cnty.*, No. 21-1689, 2023 WL 334894, at *7 (6th Cir. Jan. 30, 2023).

In *Graziosi*, the police officer posted a statement on Facebook criticizing her police chief for not permitting officers to use their patrol cars to attend the funeral of an officer killed in the line of duty. *Graziosi*, 775 F.3d at 734.  The police department terminated the officer for making these statements. *Id.* at 735.  The Court of Appeals concluded that the officer's statements on Facebook were made as a citizen, not as a public employee. *Id.* at 737.  It also concluded that the officer's statements were not protected because they did not involve a matter of public concern. Instead, they amounted to a "private employee-employer dispute[.]" *Id.* at 739.  "[S]peech about 'internal personnel disputes' generally does not involve matters of public concern." *Myers v. City of Centerville*, 41 F.4th 746, 761 (6th Cir. 2022).

But even assuming that the employee's speech in *Graziosi* was protected, the Court of Appeals concluded that insubordination was an adequate justification for terminating the plaintiff. *Graziosi*, 775 F.3d at 740.  When assessing such a justification, the Court must weigh "the employee's interest in 'commenting upon matters of public concern'" against "'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000) (quoting *Pickering v. Bd. of Ed.*, 391 U.S. 563, 568 (1968)).  In *Graziosi*, the court noted the importance of "preserving loyalty and close working relationships" in a police department. *Graziosi*, 775 F.3d at 740.  "Because 'police departments function as paramilitary organizations charged with maintaining public safety and order, they are given *more* latitude in their decisions regarding discipline and personnel

regulations than an ordinary government employer.'"  *Id.* (quoting *Nixon v. City of Houston*, 511 F.3d 494, 498 (5th Cir. 2007)).  In that context, preventing insubordination was a "substantial interest" that justified the police department's decision to terminate the plaintiff for her statements. *Id.*

Like the Fifth Circuit, the Court of Appeals for the Sixth Circuit has "long recognized 'the importance of deference' to law enforcement officials when speech threatens to undermine the functions of organizations charged with maintaining public safety."  *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017) (quoting *Brown v. City of Trenton*, 867 F.2d 318, 322 (6th Cir. 1989)).  Law enforcement officials are "not required to 'tolerate action which [they] reasonably believe[] would disrupt the office, undermine [their] authority, and destroy close working relationships[.]'"  *Brown*, 867 F.2d at 322 (quoting *Connick v. Myers*, 461 U.S. 138, 154 (1983)).

Here, Cullen attempted to have the City Manager terminate or take other action against Cullen's superior, Chief Brown.  Cullen also said that he would not follow Brown's orders.  These actions are not protected by the First Amendment.  There is no evidence that they involved matters of public concern.  And even if they were protected, the City would have had adequate justification for disciplining Cullen for this insubordinate conduct.  Accordingly, Cullen cannot rely on his discussion with Long as protected conduct to support his retaliation claims.

### (b) Adverse Actions

Brown's Disciplinary Actions Before May 2020.  Plaintiffs allege that Brown took various "disciplinary actions" toward Cullen in July 2019, January 2020, February 2020, and March 2020, ostensibly in retaliation for unidentified protected conduct.  (Am. Compl. ¶¶ 41-48, 63.)  Plaintiffs do not provide evidence to support these allegations.

At any rate, Defendants Brown and Long have withdrawn their arguments about these disciplinary actions.  (Defs. Brown & Long's Reply Br. 11, ECF No. 112.)  Accordingly, the Court

will not address them.  To the extent these actions raise a possible First Amendment claim against Brown, the Court does not address them in this Opinion.

Long's Release of Cullen's Information.  Plaintiffs apparently contend that Long released Cullen's information to Michalak in retaliation for the MSP complaint.  Recall that Cullen filed this complaint in May 2020.  The City put Brown on leave and then reinstated him in mid-September 2020, after the MSP concluded that there was insufficient evidence to pursue criminal charges.  Long became the City Manager in the first week of September.  He learned about the MSP complaint that month.  (Long Dep. 104, ECF No. 107-3.)  In October, Long reviewed Michalak's appeal of the denial of her FOIA request pertaining to Cullen and concluded that he would release records discussing citizen complaints about Cullen from 2009 and 2010.

Defendants argue that the release of information about Cullen pursuant to a FOIA request was not an "adverse employment action."  Defendants provide no legal authority for their assertion that Cullen's retaliation claim must be based upon an "adverse *employment* action" by Defendants. There are countless ways in which the state could retaliate against its employees for exercising their constitutional rights.  Cullen's employment relationship with the City did not limit the scope of his protection to actions that would affect his employment.  "The First Amendment is not a tenure provision, protecting public employees from actual or constructive discharge.  The First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employee's [constitutional freedoms]."  *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 76 (1990).  For instance, the First Amendment "protects state employees . . . from an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights[.]"  *Id.* at 75 n.8 (citations and internal quotation marks omitted).  Accordingly, the relevant question is

whether Defendants' actions could have deterred a person of ordinary firmness from exercising his constitutional rights.  Here, a jury could conclude that the release of citizen complaints and accompanying investigation record about Cullen to the public satisfies that test.

In addition, Defendants argue that Michigan's FOIA *required* the City to release the information.  In effect, Defendants are arguing that there is no causal connection between Cullen's protected conduct and the City's release of information about him because the City would have released that information even if Cullen had not engaged in protected conduct.  The Court is not persuaded by Defendants' argument.

Under Michigan's FOIA, "a public body is required to grant full disclosure of its records, unless they are specifically exempt under" Mich. Comp. Laws § 15.243.  *Detroit Free Press, Inc. v. City of Southfield*, 713 N.W.2d 28, 33 (Mich. Ct. App. 2005).  Here, Simmons initially concluded that the records were exempt as "personnel records of law enforcement agencies."  Mich. Comp. Laws § 15.243(1)(s)(ix).  Long disagreed.  According to Long, the documents were not exempt because they were not part of Cullen's personnel file.  (Long Dep. 203-04.)  Brown testified that the documents came from "an unmarked folder in the bottom of the file cabinet" in the police chief's office.  (Brown Dep. 72, 74.)  Thus, according to Defendants, the documents were not exempt because they were not physically located in Cullen's personnel file.

Contrary to Defendants' argument, the Michigan Court of Appeals has made clear that "[t]he location of documents is not determinative of the applicability of the personnel records exemption."  *Newark Morning Ledger Co. v. Saginaw Cnty. Sheriff*, 514 N.W.2d 213, 216 (Mich. Ct. App. 1994); *accord Rudd v. City of Norton Shores*, Nos. 343759, 344727, 2019 WL 2517404, at *4 (Mich. Ct. App. June 18, 2019).  Consequently, "storage of information outside a file labeled 'personnel file' does not mean that the information falls outside the scope of [the exemption]."  *Id.*

21

Thus, the location of the documents at issue here did not determine whether they were subject to the exemption.

Also, in *Newark Morning Ledger*, the Michigan Court of Appeals recognized that "internal affairs investigatory records . . . fall within the meaning of the term 'personnel record of law enforcement agencies' as used in FOIA." *Id.* at 218; *accord Kent Cnty. Deputy Sheriff's Assoc. v. Kent Cnty. Sheriff*, 616 N.W.2d 677, 684 (Mich. 2000). Some of the records at issue here appear to be investigative records concerning an officer at the police department. As such, they would potentially be subject to the exemption for the personnel records of a law enforcement agency.

Furthermore, Defendants do not address the alternate reasoning by Simmons that the records contained information "of a personal nature" that would "constitute a clearly unwarranted invasion of an individual's privacy." Mich. Comp. Laws § 15.243(1)(a). Simmons initially raised this issue. It is not clear why Long disagreed with this exemption or concluded that it did not apply. Accordingly, for all the foregoing reasons, the Court is not persuaded that Michigan's FOIA required Long to disclose the records at issue, which leaves open the possibility that retaliation was a motive for his decision.

Long argues that he is entitled to qualified immunity for the release of Cullen's records because his interpretation of the FOIA statute and the application of its exemptions was within the "range of [his] decision-making" as City Manager. (Defs. City & Long's Br., ECF No. 94, PageID.790.) Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

Here, Plaintiffs have provided evidence of a violation of a constitutional right.  Considering the three elements of a retaliation claim, Long concedes for purposes of his motion that Cullen engaged in protected conduct.  In addition, as discussed above, Cullen has provided evidence of an adverse action.  To the extent Defendants challenge the causal connection between Cullen's protected conduct and Long's decision, the Court is not persuaded that the FOIA required Long to release the records.[2]

In addition, the constitutional right was clearly established.  When Long made his decision, it was "well settled in this Circuit that retaliation under color of law for the exercise of First Amendment rights is unconstitutional[.]"  *See v. City of Elyria*, 502 F.3d 484, 495 (6th Cir. 2007) (internal quotation marks omitted).

Long urges the Court to defer to his discretion when making his decision, but the exercise of discretion does not rule out the possibility that retaliation was a motivating factor in his decision.  That motive remains a question of fact for the jury to decide.  Indeed, the performance of a discretionary act is the starting point for every qualified immunity defense.  *See Harlow*, 457 U.S. at 816 ("Immunity is generally available only to officials performing discretionary functions.").  In other words, an exercise of discretion is necessary, but it is not sufficient, for qualified immunity to apply.

Defendants discuss *Scheuer v. Rhodes*, 416 U.S. 232 (1974) as part of their qualified immunity analysis, arguing that good faith on the part of a state official is sufficient for that official to obtain qualified immunity.  (*See* Defs. Brown & Long's Br., ECF No. 92, PageID.651, 655-656.)   But that argument is inconsistent with *Harlow*, which expressly held that qualified

---

[2] Defendants make no other argument about the sufficiency of Plaintiffs' evidence regarding causation.

immunity is assessed according to an *objective* standard, not a subjective one.  *Harlow*, 457 U.S. at 815-19.

In short, at this stage, the Court is not persuaded that Long is entitled to qualified immunity for the release of the records.  If he released Cullen's records because Cullen complained about Brown to the MSP, Long violated a clearly established constitutional right.

Brown's Report about Cullen.  Construing the evidence in the light most favorable to Cullen, Brown embellished his report about Cullen's conduct at the high school with false accusations that Cullen had bumped his chest and stepped on his toe, causing Long to suspend Cullen with pay.  Note that Cullen does not provide evidence to dispute the other details of this interaction with Brown, including Cullen's repeated refusal to obey Brown's directions and his assaultive conduct.[3]

This claim fails for lack of a causal connection to an adverse action.  As Defendants note, Long made the decision to suspend Cullen, not Brown himself.  Even assuming that Brown made false statements in retaliation for Cullen's protected conduct, Plaintiffs provide no evidence that Brown's purportedly false statements about a physical assault and battery played a role in Cullen's suspension, rather than Cullen's insubordinate conduct.  Indeed, Long told Cullen at the time that he was suspending Cullen because of "an insubordination incident."  (Cullen Dep. 131.)

Furthermore, placement on paid leave is not an adverse action.  *See Harris v. Det. Pub. Schs.*, 245 F. App'x 437, 443 (6th Cir. 2007) ("We have held . . . 'that a suspension with pay and full benefits pending a timely investigation into suspected wrongdoing is not an adverse

---

[3] By "assaultive conduct," the Court refers to Colby's finding that Cullen turned back around and confronted Brown before leaving the school building, causing Brown to raise his hands in self-defense.  Cullen himself acknowledges that he turned back around to face Brown.  (11/23/2022 Cullen Decl. ¶ 37, ECF No. 116-2.)

employment action.'" (quoting *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (italics omitted)).

To the extent Plaintiffs contend that Brown's false statements led to Cullen's termination, no evidence supports that contention.  There is no genuine dispute that Long relied on the Colby report, which could not verify Brown's allegedly false statements.  Indeed, Long's termination letter does not mention any of Brown's allegedly false assertions as the basis for Cullen's termination.

Moreover, Brown raises the defense of qualified immunity.  (*See* Brown & Long's Mot. for Summ. J. ¶ 4, ECF No. 91.)  He is entitled to qualified immunity for any retaliation claim based on Cullen's suspension and termination because Brown was not the final decisionmaker for those actions.  At the time of his conduct, it was not clearly established that "individuals who are not final decisionmakers can be held liable for the actions of the final decisionmaker . . . in the [First Amendment] retaliation context."  *Yerkes v. Ohio State Highway Patrol*, No. 22-3030, 2022 WL 17753528, at *7 (6th Cir. Dec. 19, 2022).  Accordingly, for all the foregoing reasons, Brown is entitled to summary judgment for Plaintiffs' retaliation claim.

Long's Termination of Cullen.  Defendants contend that there is no evidence of a causal connection between Long's termination and any protected conduct by Cullen.  Here, Cullen filed his MSP complaint several months before his termination.  "[T]emporal proximity alone is rarely, if ever, sufficient to establish causation.  There generally must be other indicia of retaliatory conduct."  *Sensabaugh v. Halliburton*, 937 F.3d 621, 630 (6th Cir. 2019).  Long testified that he reviewed Colby's report when making his decision.  No evidence suggests that Long considered any protected conduct by Cullen when making his decision, let alone that such conduct motivated his decision.  Also, no evidence suggests that the City would have made a different decision

without Cullen's protected conduct.  Cullen's insubordinate behavior, standing alone, was plainly sufficient to terminate him.  Accordingly, Long is also entitled to summary judgment for Plaintiffs' retaliation claim concerning Cullen's termination.

### B. City

The City notes that it is subject to liability under § 1983 only under the parameters set forth in *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  There, the Supreme Court held that municipalities could be liable under § 1983 for constitutional violations, but they "cannot be liable for the constitutional torts of [their] employees."  *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007).  In other words, "[a] municipality may not be held liable under § 1983 on a *respondeat superior* theory . . . '*solely* because it employs a tortfeasor.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (quoting *Monell*, 436 U.S. at 691). Instead, Plaintiffs must "identify [a] custom, policy or practice of Defendant, connect that policy to the Defendant and show it caused a constitutional violation."  *Jordan v. City of Det.*, 557 F. App'x 450, 457 (6th Cir. 2014).

Plaintiffs can meet the policy requirement by demonstrating "'(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.'"  *Wiley v. City of Columbus*, 36 F.4th 661, 670 (6th Cir. 2022) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).  Here, there is no dispute that City Manager Long made the final decision to release the records pertaining to Cullen and to terminate him.  And Plaintiffs note that Long was the "chief administrative officer" of the City under the City's Charter.  (*See* City Charter § 4, ECF No. 105-4, PageID.1363.)  Thus, the record before the Court indicates that the official with final decision-making authority for the City took the adverse actions at issue.

26

The City is not liable under § 1983 for Cullen's termination because, as discussed above, there is no genuine dispute that Long terminated Cullen for his insubordinate behavior, not for his protected conduct.  *See Westmoreland v. Butler Cnty.*, 29 F.4th 721, 731 (6th Cir. 2022) ("'If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983.'" (quoting *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001)).  Thus, the question is whether the City can be liable for Long's decision to release the records about Cullen, if he released them in retaliation for Cullen's protected conduct.

Defendants respond that Plaintiffs are merely challenging isolated decisions by the City Manager, who made them in the exercise of his discretion.  Such decisions, they argue, are not sufficient to impose liability on the City because they do not suggest a pattern or policy of unconstitutional conduct by the City.  Plaintiffs rely on *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986), which held that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."  *Id.* at 480.  However, Defendants note that a policymaking official's exercise of discretion "does not, without more, give rise to municipal liability based on an exercise of that discretion."  *Id.* at 481.  Instead, "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives  by the official or officials responsible for establishing final policy with respect to the subject matter in question."  *Id.* at 482.  Otherwise, a municipality would effectively be liable on the basis of *respondeat superior*, which is prohibited by *Monell*.

The Court finds some appeal in Defendants' argument, but *Pembaur* does not explain its distinction between merely exercising discretion in a single decision and choosing "a course of action . . . from among various alternatives."  And more recent precedent undermines Defendants' position.  In *Meyers v. City of Cincinnati*, 14 F.3d 1115 (6th Cir. 1994), the Court of Appeals

clarified that *Monell* "is not meant to distinguish isolated incidents from general rules of conduct. It is meant to distinguish those injuries for which 'the government as an entity is responsible under § 1983.'" *Id.* at 1117 (quoting *Monell*, 436 U.S. at 694); *accord Paterek v. Vill. of Armada*, 801 F.3d 630, 651 (6th Cir. 2015).  In *Meyers*, a city manager purportedly discharged the city's fire chief in retaliation for the fire chief's exercise of his First Amendment rights.  *Id.*  The fire chief appealed that decision and the city's civil service commission denied the appeal.  *Id.*  Although the city manager's decision ostensibly involved an exercise of discretion, the court concluded that the city could be liable because the civil service commission, as the final decision-maker, ratified the city manager's decision.  *Id.* at 1118.

Similarly, Plaintiffs have provided evidence that Long was the final decisionmaker for approving Michalak's FOIA requests.  If he did this in retaliation for Cullen's protected conduct, the City could be liable under § 1983.  *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997) ("[P]roof that a municipality's . . . authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably.").  And as discussed above, the Court is not persuaded that Long is entitled to summary judgment for Plaintiffs' retaliation claim regarding Long's decision to release the records about Cullen.  Accordingly, the City remains a defendant for that claim.

### C. Mayor Litzner

Defendant Litzner argues that the complaint fails to state a viable claim against her.  She seeks judgment on the pleadings and/or summary judgment.  As far as Litzner is concerned, Plaintiffs allege that "Mr. Brown, Mr. Long, Ms. Litzner and/or Mr. Strait" provided "non-public or inside information" to Michalak.  (Am. Compl. ¶ 97.)  Plaintiffs also allege that "Mr. Brown, Mr. Long, and/or Ms. Litzner did release to [Michalak] an entire unredacted copy of [Cullen's] personnel record."  (*Id.* ¶ 126.)  In addition, Plaintiffs broadly allege that the "City Defendants"

subjected Cullen to "adverse employment actions, retaliation, and discrimination, including" actions discussed elsewhere in the complaint.  (*Id.* ¶ 182.)  Litzner is one of the "City Defendants."

Plaintiffs' vague and conclusory allegations about groups of individual defendants are not sufficient to put Litzner on notice of the § 1983 claim against her.  *See Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019) ("Summary reference to a single, five-headed 'Defendants' does not support a reasonable inference that *each* Defendant is liable for retaliation."); *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011) ("This Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right.").  Similarly, in their response to Litzner's motion, Plaintiffs do not identify the specific conduct by Litzner that forms the basis for a retaliation claim against her. Instead, Plaintiffs merely cite paragraphs of their complaint that allege actions by other defendants. (*See* Pls.' Resp. to Litzner's Mot. 6, ECF No. 88.)  Accordingly, Plaintiffs' allegations are not sufficient to state a retaliation claim against Litzner.

Even if Litzner was not entitled to judgment on the pleadings, she would be entitled to summary judgment.  At this stage of the case, there is no genuine dispute that Defendant Long released Cullen's records and Defendant Long terminated Cullen.  No evidence suggests that Litzner was involved in those decisions, or in any other adverse action against Plaintiffs.  Plaintiffs point to the fact that Litzner had a telephone conversation with Michalak because Michalak had been copying Litzner in her FOIA requests.  (Litzner Dep. 32-34, ECF No. 81-3.)  But that evidence does not permit a reasonable inference that Litzner influenced Long's decisions or was otherwise involved in a retaliatory action toward Plaintiffs.

Finally, Plaintiffs argue that it would be premature to grant summary judgment in Litzner's favor because discovery had not completed when she filed her motion and there was "outstanding discovery due from the Defendants" that "relate to and/or constitute electronic communications between the individual Defendants."  (Miotke Decl. ¶ 4, ECF No. 88-2.)  But the Court is not persuaded that Plaintiffs have shown that, "for specified reasons, [they] cannot present facts essential to justify [their] opposition" to Litzner's motion.  Fed. R. Civ. P. 56(d).  Plaintiffs simply speculate that they may uncover incriminating evidence of retaliation or a conspiracy to retaliate after reviewing unidentified "electronic communications."   Thus, insofar as Litzner seeks summary judgment, there is no genuine dispute that she did not retaliate against Plaintiffs.

## VI. COUNT II: WPA

Cullen also claims that the City and Defendants Brown, Long, and Litzner violated his rights under the WPA. Defendant Litzner seeks judgment on the pleadings and/or summary judgment on this claim.

The WPA contains the following prohibition for employers:

> An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

Mich. Comp. Laws § 15.362.  The WPA defines "employer" as "a person who has 1 or more employees"; this definition includes "an agent of an employer and the state or a political subdivision of the state."  Mich. Comp. Laws § 15.361(b).

To establish a prima facie case under [the WPA], a plaintiff must show that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the plaintiff

was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action.

*West v. Gen. Motors Corp.*, 665 N.W.2d 468, 471-72 (Mich. 2003) (footnote omitted).

First, Defendant Litzner argues that she is not an "employer" subject to liability under the WPA.  By its terms, however, the WPA also applies to the "agent" of an employer.  Neither party cites any authority discussing whether or not an individual employee can be liable under the WPA.  In an unpublished decision, the Michigan Court of Appeals has held that an individual "to whom an employing entity delegates supervisor power and authority to act on its behalf" could be liable under the WPA.  *Glover v. Pontiac Housing Comm'n*, No. 281737, 2008 WL 5431174, at *5 (Mich. Ct. App. Dec. 30, 2008) (internal quotation marks omitted).  It reasoned that the Michigan Supreme Court has interpreted a similar definition of employer in the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2102 et seq., to permit suit against an individual.  *See Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 863 (Mich. 2005).  The Court agrees with that reasoning.

At any rate, as with Plaintiffs' retaliation claim against Litzner, Plaintiffs do not adequately plead facts from which to infer that Litzner retaliated or discriminated against them because of any protected activity.  Instead, Plaintiffs group Litzner together with other defendants when describing the adverse actions.  It is also not clear from the complaint what Plaintiffs believe is the protected activity that purportedly motivated any of Litzner's actions.  And Plaintiffs provide no additional clarity in their briefing.

Moreover, as discussed above, even if Plaintiffs' allegations were sufficient, there is no genuine dispute that Litzner was not involved in any decisions regarding Cullen's employment.  Accordingly, Litzner would be entitled to summary judgment. Thus, the Court will dismiss the WPA claim against Litzner.

## VII. COUNT III: ERKA

Plaintiffs claim that the City and Defendants Brown, Long, and Litzner violated Cullen's rights under Sections 6, 7, 8, and 9 of the ERKA when the City released records to Michalak.  (Am. Compl. ¶¶ 203-04.)  The City and Defendant Long move for summary judgment on this claim.[4] Defendant Litzner moves for judgment on the pleadings and/or summary judgment.  Plaintiffs move for summary judgment against the City and Defendant Long.

### A. The City & City Manager Long

#### 1. Sections 6 and 7 of the ERKA

Defendants seek summary judgment on Plaintiffs' claim under Sections 6 and 7 of the ERKA.  Section 6 requires an employer to provide written notice to the employee before disclosing disciplinary records.  It provides as follows:

> An employer or former employer shall not divulge a disciplinary report, letter of reprimand, or other disciplinary action to a third party, to a party who is not a part of the employer's organization, or to a party who is not a part of a labor organization representing the employee, without written notice as provided in this section.

Mich. Comp. Laws § 423.506(1).

Section 7 requires the employer to review personnel records and delete disciplinary records that are more than four years old:

> An employer shall review a personnel record before releasing information to a third party and delete disciplinary reports, letters of reprimand, or other records of disciplinary action that are more than 4 years old. . . .

Mich. Comp. Laws § 423.507.

Defendants argue that Sections 6 and 7 do not apply because the records released to Michalak were not personnel records, disciplinary reports, or other records of a disciplinary action.

---

[4] Like the WPA, the ERKA applies to "employers," which is defined to include "an agent of the employer."  Mich. Comp. Laws § 423.501(2)(b).

The ERKA defines "personnel record" as

a record kept by the employer that identifies the employee, to the extent that the record is used or has been used, or may affect or be used relative to that employee's qualifications for employment, promotion, transfer, additional compensation, or disciplinary action.  A personnel record shall include a record in the possession of a person, corporation, partnership, or other association who has a contractual agreement with the employer to keep or supply a personnel record as provided in this subdivision.

Mich. Comp. Laws § 423.501(c).  A personnel record does not include "[i]nformation that is kept separately from other records and that relates to an investigation by the employer pursuant to section 9."  *Id.* § 423.501(c)(v).

The Court agrees with Defendants that the records released by the City were not "personnel records" as defined by the ERKA.  Instead, they were records that related to an investigation by Cullen's employer.  As such, they were excluded from the definition of personnel records through Mich. Comp. Laws § 423.501(c)(v).

In addition, the records did not contain a disciplinary report.  The ERKA does not expressly define "disciplinary report."  Plaintiffs argue that the records released to Michalak contained a disciplinary report because a page of those records concludes that Cullen violated departmental policies and recommends that "some kind of disciplinary action be taken."  (Records, ECF No. 103-4, PageID.1276.)   But, as Defendants point out, this statement was simply a recommendation that followed from an investigation.  There is no evidence that the City accepted this recommendation or took any disciplinary action.  A recommendation for discipline is not necessarily a disciplinary report.  Indeed, when using the term "disciplinary report," the ERKA is focused more generally on "disciplinary actions."  A recommendation to impose discipline is not itself a disciplinary action by Cullen's employer.  Accordingly, the Court agrees that Sections 6 and 7 of the ERKA do not apply.

### 2. Section 8 of the ERKA

Plaintiffs argue that the relevant provisions of the ERKA are found in Sections 8 and 9.

Section 8 provides:

> (1) An employer shall not gather or keep a record of an employee's associations, political activities, publications, or communications of nonemployment activities, except if the information is submitted in writing by or authorized to be kept or gathered, in writing, by the employee to the employer. This prohibition on records shall not apply to the activities that occur on the employer's premises or during the employee's working hours with that employer that interfere with the performance of the employee's duties or duties of other employees.

> (2) A record which is kept by the employer as permitted under this section shall be part of the personnel record.

Mich. Comp. Laws § 423.508. Plaintiffs argue that the records released by the City contained information about Cullen's nonemployment associations and activities, and that the City was not authorized to gather or retain this information.

Plaintiffs' argument defies logic and conflicts with the rest of the ERKA. As indicated, the records contained citizen complaints about Cullen. The City did not "gather" this information; others provided it. Furthermore, it would make no sense for the statute to prohibit government entities from keeping a record of citizen complaints about its officials and investigating them if necessary, which is what occurred here.

In addition, as discussed below, Section 9 of the ERKA expressly allows law enforcement agencies to investigate "alleged criminal activity or the violation of an agency rule" and to keep that information in a separate, confidential file. Mich. Comp. Laws § 423.509(2). There is no genuine dispute that the records here discussed an investigation of alleged criminal activity and/or a violation of the City's departmental policies by Cullen. Accordingly, Section 8 does not apply. Although Plaintiffs sought summary judgment on this issue, the Court will grant summary judgment to Defendants because Plaintiffs were on notice of the evidence necessary to assert their

claim and a determination of whether the records fall under Section 8 of the ERKA is a question of law, not a question of fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (describing when a Court can enter summary judgment *sua sponte*).

### 3. Section 9 of the ERKA

Section 9 states, in relevant part:

An employer that is a criminal justice agency and that is involved in the investigation of an alleged criminal activity or the violation of an agency rule by an employee shall maintain a separate confidential file of information relating to the investigation. Upon completion of the investigation, if disciplinary action is not taken, the employee must be notified that an investigation was conducted. If the investigation reveals that the allegations are unfounded or unsubstantiated or if disciplinary action is not taken, the separate file must contain a notation of the final disposition of the investigation and information in the file must not be used in any future consideration for promotion, transfer, additional compensation, or disciplinary action. The employer may release information in the separate file to a prospective employing law enforcement agency if the information is part of a record regarding the reason or reasons for, and circumstances surrounding, a separation of service under section 5 of the law enforcement officer separation of service record act, 2017 PA 128, MCL 28.565. The employer shall release information in the separate file to the Michigan commission on law enforcement standards upon the request of the Michigan commission on law enforcement standards.

Mich. Comp. Laws § 423.509(2).

Plaintiffs argue that, to the extent the records contain information relating to the investigation of Cullen for alleged criminal activity and/or a violation of departmental policies, the City violated the ERKA by not keeping the records confidential and by not making a notation in its file of the "final disposition of the investigation[.]" *See id.*

Notation Requirement. Here, there is no genuine dispute that the records concerned an investigation into a violation of departmental rules by a criminal justice agency and that the City was involved in that investigation. There is no evidence, however, as to whether the City made a notation in its file regarding the final disposition of the investigation. Plaintiffs surmise that no such notation existed, but they provide no evidence to support their assertion. Although it is

difficult to prove a negative, the Court must construe the evidence in Defendants' favor for purposes of Plaintiffs' motion for summary judgment.  Moreover, Plaintiffs could have questioned Defendants about the existence of such a notation, but there is no evidence that they did so.

Confidentiality Requirement.  As to the confidentiality requirement, the Court agrees that the City violated the ERKA by not keeping the investigative records confidential.  The ERKA required the City to keep these records in a "confidential file."  It did not do so.  Instead, it released them to Michalak.  Defendants make no argument whatsoever regarding the applicability of Mich. Comp. Laws § 423.509(2).  Defendants focus their arguments on a different section that is not at issue here, Mich. Comp. Laws § 423.509(1).

The Court need not address whether there is a potential conflict between the ERKA (which appears to prohibit any disclosure of the investigative records) and Michigan's FOIA (which appears to allow disclosure of such records when the public interest warrants it) because the City and Long expressly disavow any such arguments.  (Defs.' Br. in Opp'n to Pls.' Mot. 18, ECF No. 111.)  And there is no evidence that Long even considered the FOIA exemption for law enforcement records or weighed the public interest when making his decision.

Defendants also suggest that they have governmental immunity under state law.  However, ERKA constitutes a waiver of governmental immunity because it expressly applies to employers and agents of employers, including "the state or an agency or a political subdivision of the state." Mich. Comp. Laws § 423.501(2)(b); *see Riopelle v. Zittel*, No. 275403, 2008 WL 2117498, at *3 (Mich. Ct. App. May 20, 2008) (rejecting argument that ERKA claim was barred by governmental immunity); *see also Ballard v. Ypsilanti Twp.*, 577 N.W.2d 890, 895 (Mich. 1998) (explaining that "an express statutory enactment" can subject the state to liability).

36

### B. Mayor Litzner

Litzer argues that the complaint fails to state a claim against her under the ERKA.  Plaintiffs respond that Sections 6, 7, 8, and 9 of the ERKA impose various duties on employers.  Plaintiffs argue in conclusory fashion that "the City Defendants" had these duties and that "the City Defendants" violated these duties.  (Pls.' Resp. Br. 11, ECF No. 88.)  Plaintiffs' complaint does not explain why those duties fall on Litzner, or what she did to violate them.  For reasons discussed above with respect to Plaintiffs' other claims against Litzner, Plaintiffs' vague and conclusory allegations do not suffice to put Litzner on notice of the basis for their ERKA claim.  Thus, the Court will dismiss the ERKA claim against her.

In addition, there is no genuine dispute that Litzner did not make the decision to disclose the records about Cullen.  Thus, to the extent Plaintiffs claim that this disclosure violated the ERKA, Litzner would be entitled to summary judgment for this claim.  Accordingly, the Court will dismiss Litzner from this claim.

### VIII. COUNT IV: TORTIOUS INTERFERENCE

Plaintiffs claim that Defendants Brown, Litzner, Long, and Michalak tortiously interfered with Plaintiffs' contract, business relationship and/or business expectancy regarding Plaintiffs' ownership and operation of the cannabis dispensary.  Plaintiffs contend that the City's release of its records about Cullen caused the other investors in the business to push Plaintiffs out.  After the news media reported on those records, one investor told Cullen that "he could not save [Plaintiffs] in relation to the other investors and [Plaintiffs'] interest in the LLC."  (11/23/2022 Cullen Decl. ¶ 54.)  Thereafter, the other investors refunded Plaintiffs' investment.  (*Id.* ¶ 55.)

Defendant Litzner seeks judgment on the pleadings and/or summary judgment on Plaintiffs' claim of tortious interference.  Defendant Michalak seeks summary judgment on this claim.

The elements of tortious interference with a business relationship or expectancy are:

(1) the existence of a valid business relationship or expectancy that is not necessarily predicated on an enforceable contract, (2) knowledge of the relationship or expectancy on the part of the defendant interferer, (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy was disrupted.

*Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 706 N.W.2d 843, 849 (Mich. Ct. App. 2005).

### A. Michalak

The evidence does not support the third and fourth elements of Plaintiffs' claim against Michalak, both of which involve causation.  Stacey Frisinger testified that she ran a cannabis dispensary business in Adrian, Michigan, that she and her business partners planned to expand to Sault Ste. Marie.  (Frisinger Dep. 7, 19, ECF No. 109-11.)  They began discussions with Plaintiffs in late 2020 about these plans.  The investors planned to acquire property to run the business and eventually Mary Cullen would manage the store.  (*Id.* at 11.)  Plaintiffs were to invest $250,000 as well as "sweat equity," and they paid $125,000 of this investment.  (*Id.* at 12-14.)  At one point, the investors circulated a draft operating agreement that was never signed.  (*Id.* at 13.)

In February, one of Frisinger's business partners, Joel Boyce, received a phone call from the Detroit Free Press asking for comment on its February 1, 2021, article regarding Cullen and the St. Ignace police.  (Frisinger Dep. 20.)  Boyce told Frisinger about the article.  (*Id.* at 22.)  After learning about this article, Frisinger and the other business partners were concerned that Cullen's Fascebook threat was a "red flag."  (*Id.* at 23.)  They later discovered that there had been a "state police investigation [about Cullen] and a fight or disagreement with his boss."  (*Id.* at 24.)  And then they learned through conducting due diligence that Mary Cullen and her father had been indicted by the federal government in the past for fraud, and that her father was eventually

convicted.  (*Id.*; *see* 1/20/2010 FBI News Release, ECF No. 109-13.)  They were concerned about her involvement in that matter.  (*Id.* at 28.)  The combination of these factors caused the investor group to "uninvite" Plaintiffs from the business opportunity.  (*Id.* at 25.)  Another investor, Sean McQuarrie, confirmed these details, as did Jason Klonowski, a friend of Plaintiffs who introduced Plaintiffs to the investment group.  (McQuarrie Dep. 21-23, ECF No. 109-12; Klonowski Dep. 16-22, ECF No. 109-14.)  None of these witnesses testified that the investors relied on any information derived from the records released by the City.

Plaintiffs respond that Klonowski, who was not an investor, initially told Plaintiffs that "when this news thing came on . . . it will blow over."  (Klonowski Dep. 25, ECF No. 116-11.)  But "then the next day another news cycle hit and then [the investors] said that's enough."  (*Id.*)  Plaintiffs argue that Klonowski was referring to more than one news article on successive days.  They contend that his first reference was to the Detroit Free Press article and his second reference was to news articles discussing the records released by the City.  But this is merely speculation by Plaintiffs, who are relying on vague references to "news thing" and "news cycle" in Klonowski's testimony.  Moreover, Klonowski did not necessarily know the basis for the investors' decisions.  Indeed, when asked about allegations that Cullen had engaged in inappropriate behavior with teenage girls, Frisinger and McQuarrie denied any knowledge of such allegations.  (Frisinger Dep. 97-98; McQuarrie Dep. 62.)  Similarly, at his deposition, Klonowski repeatedly referred to the Detroit Free Press article mentioned above when asked about "bad press" or "bad publicity" regarding Cullen; he could not recall any other negative publicity that would have impacted the investors' decisions.  (Klonowski Dep. 21, 41-42, ECF No. 117-3.)

In short, there is no genuine dispute that the release of information instigated by Michalak played no role in Plaintiffs' loss of their business opportunity.  Accordingly, Michalak is entitled to summary judgment for Plaintiffs' claim of tortious interference.

### B. Mayor Litzner

Plaintiffs' claim against Defendant Litzner is also deficient.  The complaint merely alleges in conclusory fashion that Litzner, along with Michalak and the other City defendants, "did intentionally and improperly interfere with the Plaintiffs' contract, business relationship, and/or business expectancy[.]"  (Am. Compl. ¶ 210.)  The complaint does not identify any conduct by Litzner that would qualify as interference.  Accordingly, the Court will dismiss this claim against Litzner.

### IX. COUNT V: CONSPIRACY

Plaintiffs claim that Defendants conspired to violate Plaintiffs' rights under the Constitution, the WPA, and the ERKA.  A civil conspiracy under § 1983 requires evidence of "an agreement between two or more persons to injure another by unlawful action."  *Boxill*, 935 F.3d at 519 (quoting *Memphis, Tennessee Area Local, Am. Postal Workers Union, AFL-CIO v. City of Memphis*, 361 F.3d 898, 905 (6th Cir. 2004)).  "The plaintiff must plead enough facts to support a reasonable inference "that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant."  *Id.*  Similarly, under Michigan law, a civil conspiracy "is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means."  *Swain v Morse*, 957 N.W.2d 396, 409 (Mich. Ct. App. 2020).

### A. Litzner

As with Plaintiffs' other claims against Litzner, the allegations about Litzner are vague and conclusory.  Indeed, as discussed above, there is no allegation or evidence that Litzner took any action in relation to Plaintiffs, let alone an overt act in furtherance of a conspiracy that caused injury to Plaintiffs.  Accordingly, Plaintiffs do not possess a viable conspiracy claim against Litzner and the Court will dismiss her from this claim.

### B. Michalak

Plaintiffs' allegations against Michalak are similarly vague and conclusory.  Moreover, Plaintiffs do not address Michalak's arguments that, as a private citizen who is not Cullen's employer, she cannot be liable under § 1983, the WPA, or the ERKA.  There are limited circumstances in which a private actor can be considered to act under color of state law for purposes of § 1983, *see Tahfs v. Proctor*, 316 F.3d 584, 590-91 (6th Cir. 2003), and Plaintiffs address none of them in their briefing.  In addition, the WPA and the ERKA apply to employers. Plaintiffs provide no authority permitting the Court to find that a private actor with no employment relationship to the plaintiff can be liable under those statutes.  It is not the Court's responsibility to raise arguments on Plaintiffs' behalf.  Accordingly, the Court will dismiss this claim as to Michalak.

## X. COUNT VI: CONCERT OF ACTION

Defendant Michalak argues that there is no viable cause of action in Michigan for "concert of action," citing *Mueller v. Brannigan Bros. Rests. & Taverns LLC*, 918 N.W.2d 545 (Mich. Ct. App. 2018).  There, the Michigan Court of Appeals concluded that "'concert of action' is in fact no longer a viable cause of action in Michigan" due to the passage of Mich. Comp. Laws § 600.2956 in 1995.  Under the "traditional theory" of concert of action, all defendants acting pursuant to a common design are liable for the "entire result."  *Mueller*, 918 N.W.2d at 555

(quoting *Abel v. Eli Lilly & Co.*, 343 N.W.2d 164, 176 (Mich. 1984)).  In other words, the theory

"permitted a plaintiff to hold a defendant liable for the tortious conduct of others, if that defendant

acted in concert with others to cause the plaintiff injury."  *Bauer v. Hammon*, No. 339703, 2019

WL 573060, at *7 (Mich. Ct. App. Feb. 12, 2019).  However, Mich. Comp. Laws § 600.2956 now

provides for *several* liability only, not joint liability:

> Except as provided in section 6304, in an action based on tort or another legal theory
> seeking damages for personal injury, property damage, or wrongful death, the
> liability of each defendant for damages is several only and is not joint. However,
> this section does not abolish an employer's vicarious liability for an act or omission
> of the employer's employee.

Mich. Comp. Laws § 600.2956 (footnote omitted).  Similarly, Mich. Comp. Laws § 600.6304

provides that "when there is common liability among multiple tortfeasors . . . liability 'is several

only and not joint.'"  *Mueller*, 918 N.W.2d at 555.  Further, Mich. Comp. Laws § 600.2957(1)

provides that "'the liability of each person shall be allocated . . . in direct proportion to the person's

percentage of fault[.]'"  *Id.* (quoting Mich. Comp. Laws § 600.2957(1)).

Since *Mueller*, the Michigan Court of Appeals and several federal district courts have

reiterated its holding and dismissed claims for concert of action.  *See, e.g.*, *Jacob v. Absolute Motor

Cars, Inc.*, No. 353651, 2021 WL 4143045, at *6 (Mich. Ct. App. Sept. 9, 2021); *Bauer*, 2019 WL

573060, at *7; *Shefa, LLC v. City of Southfield*, No. 220CV11038TGBEAS, 2021 WL 4440401,

at *10 (E.D. Mich. Sept. 28, 2021); *Bridgewater v. Hilton Hotels Corp.*, No. 20-11888, 2021 WL

3032511, at *6 (E.D. Mich. July 19, 2021); *Est. of Nickerson v. Ocwen Loan Servicing, LLC*,

No. 18-13965, 2019 WL 6877888, at *7 (E.D. Mich. Dec. 17, 2019); *Holbrook v. Prodomax

Automation, Ltd.*, No. 1:17-CV-219, 2019 WL 6840187, at *4 (W.D. Mich. Aug. 26, 2019).

Plaintiffs respond that *Mueller* is inconsistent with *Gerling Konzern Allgemeine

Versicherungs AG v. Lawson*, 693 N.W.2d 149 (Mich. 2005), which noted that "the 1995 tort

reform legislation does not negate the existence of common liability among . . . multiple

tortfeasors," where those tortfeasors are responsible for the same injury. *Id.* at 155. Instead, what differs is "the terms and conditions by which that liability must be satisfied." *Id.* Where there is a judgment, the tortfeasor "need only pay a percentage of the common liability that is proportionate to his fault." *Id.* Plaintiffs also cite *Urbain v. Beierling*, 835 N.W.2d 455 (Mich. Ct. App. 2013), in which the Michigan Court of Appeals described the basis for a concert-of-action claim. *Id.* at 463-64.

The Court is not persuaded that *Gerling* or *Urbain* are in conflict with the holding in *Mueller*. *Urbain* does not discuss the theory of concert of action and its relationship to Michigan's 1995 tort reform, so it does not aid Plaintiffs' argument. *Gerling* establishes that common liability is still available after the 1995 tort reform, but it does not endorse the traditional concert-of-action theory that all the defendants involved in a common design are jointly liable for all damages arising from a plaintiff's injury. Instead, like *Mueller*, *Gerling* affirms that a tortfeasor "need only pay a percentage of the common liability that is proportionate to his fault." *Gerling*, 693 N.W.2d at 155.

Here, Plaintiffs can pursue a theory of common liability against multiple tortfeasors under their conspiracy claim. But if they succeed, they cannot impose joint liability on all the defendants, as a concert-of-action theory would have allowed. Accordingly, the Court will dismiss Count VI because it is not a viable cause of action.

## XI. CONCLUSION

For all the foregoing reasons, the Court will grant the motions by Litzner and Michalak, dismissing them from the case. The Court will grant the motions by the City, Brown, and Long, in part. And the Court will grant Plaintiffs' motion, in part.

The claims still pending are: Count I (retaliation) by Cullen against the City, Brown, and Long; Count II (WPA) against the City, Brown and Long; Count IV (tortious interference) against Brown and Long; and Count V (conspiracy) against Brown and Long.

43

The Court will enter an order consistent with this Opinion.


Dated: <u>February 10, 2023</u>                              <u>/s/ Hala Y. Jarbou</u>
                                                                            HALA Y. JARBOU
                                                                            CHIEF UNITED STATES DISTRICT JUDGE